(No. 34284.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LLOYD ELDON MILLER, JR., Plaintiff in Error.

*Opinion filed January 24, 1958—Rehearing denied March 12, 1958.*

WILLIAM H. MALMGREN, and GEORGE K. MEUTH, both of Canton, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BLAINE RAMSEY, State's Attorney, of Lewistown, (FRED G. LEACH, and ROGER W. HAYES, of counsel,) for the People.

Per CURIAM: Following a trial by jury in the circuit court of Hancock County, where the cause was heard on a change of venue from Fulton County, the defendant, Lloyd Eldon Miller, Jr., was convicted of the murder of

Janice May, an eight-year-old child, and was sentenced to death. He has sued out this writ of error to review the judgment.

Janice May lived with her parents and two brothers, aged thirteen and fifteen, at the family residence in Canton, Fulton County, Illinois. The parents left the home at approximately 2:35 P.M. on Saturday, November 26, 1955, leaving the children. After a short time the boys left for a nearby school playground but returned within minutes to see if Janice had finished washing dishes. Their sister was not in the house and when she had not returned in an hour, during which the boys watched television, the youngest brother set out to look for her. His search brought him to some abandoned mine cars which had been upended and stacked in rows along a railroad right of way that passed near the school yard. Attracted by a noise the youth looked underneath one of the cars and saw what he thought was an injured dog. At this he returned for his older brother and the latter discovered that it was Janice under the car. She was unconscious from injuries described by a physician as being a crushing of the right side of the face, two skull fractures, a two and one-half inch laceration on the chin, abrasions on the neck, chest and back, a tear of the vagina with active bleeding, and a bulging of the rectum into the vaginal vault through the tear. She was almost nude and her body, which appeared to witnesses to have been pushed under the car, was extremely bloody and had cinders imbedded in the buttocks. Police and an ambulance were summoned shortly after 4:32 P.M. and the child was removed to a hospital where she died an hour later without regaining consciousness.

So far as known there were no eyewitnesses to what befell Janice, no persons who saw her with defendant on that date, and it appears that the mine cars were stacked in such a manner as to enclose an open area not visible from the outside. The oldest brother found a chunk of

concrete lying on his sister's arm and it was recovered by the police. Subsequent tests showed the concrete to be stained with human blood from group A and, in this respect, proof was made that the deceased's blood group was A, while that of defendant is O. Three days after the crime, on Tuesday, November 29, Canton police found a pair of jockey-type underwear shorts at the "VanBuren Flats" several blocks from where Janice was found and it was determined that they were stained with human blood from group A. On the same day the police found a gray jacket frozen in the water underneath a creek bridge at the city limits. Spots on the right cuff and collar were found to be human blood but the chemist, who explained that cold water would dilute and dissolve blood, did not recover a large enough specimen to test for blood group.

Defendant, then twenty-nine years old, lived alone in a rented room and was employed as a cab driver by a Canton firm, his hours of employment being from 6:00 P.M. to 6:00 A.M. On November 26, 1955, he reported for work at 6:15 P.M. and thereafter made service calls in and around Canton until the early hours of Sunday, November 27. One of his passengers was Betty Baldwin, a waitress in a restaurant patronized by defendant, and when she heard on Sunday that defendant was missing with his cab she reported to authorities a conversation wherein defendant allegedly admitted he was responsible for Janice May's death. At the trial defendant denied such a conversation or admission. In giving an account of his movements, defendant testified he left Canton at 3:45 A.M., November 27, and drove to Peoria, approximately twenty-five miles away, where he inquired by telephone concerning bus schedules to Detroit, Michigan. Thereafter he drove to Pekin, about ten miles from Peoria, where he abandoned his cab, changed his work jacket for one he had in a suitcase, and, at 5:55 A.M. boarded a bus for Champaign. In the latter city he took a bus for Danville where he arrived

at 11:00 A.M. and registered in a hotel under his own name. He testified he slept for twenty-four hours after which he left the hotel and attended a movie. Fulton County authorities, in the meantime, had apparently been successful in tracing defendant's movements by bus and were in Danville with a warrant charging him with larceny of the taxicab. While eating on the evening of Monday, November 28, defendant heard a radio broadcast that he was wanted in Canton on suspicion of murder and also saw his name in the headlines of a newspaper. According to defendant his reaction was to become confused and frightened and he resolved to continue on to Detroit. At approximately 8:00 P.M., while making inquiries at the bus station, he was arrested by a Danville detective and a Fulton County deputy sheriff who had been summoned when the station manager recognized defendant from police descriptions. His initial statement to his captors was: "If its about that little girl in Canton, I didn't do it." Later in the evening, according to the deputy, defendant put his head in his hands and said nothing when directly accused of killing Janice May. See: *People* v. *Nitti,* 312 Ill. 73.

Defendant was taken to the police station where he was given a cursory physical examination, then questioned for forty-five minutes by the Danville police chief and Fulton County Sheriff, Virgil Ball, concerning his departure from Canton and the murder of Janice May. He denied his guilt and demanded (by his version) or agreed (by Ball's version) to take a lie detector test. To accomplish such a test Ball, a deputy, and the defendant left Danville for Springfield at 11:00 P.M. and, upon arriving in the latter city at 2:00 A.M., defendant was lodged in the Sangamon County jail. During the next forty-eight hours he was questioned upon two occasions at the Illinois State Crime Laboratory and ultimately signed a confession to the crime. Thereafter, on Thursday, December 1, he was given a preliminary hearing before a police magistrate in Lewistown, the county

seat of Fulton County. He was indicted in the same county on January 11, 1956, and a trial commenced on June 11 ended with the allowance of defendant's motion for a mistrial on the ground that the inhabitants of Fulton County were prejudiced against him. A change of venue to Hancock County was granted and this writ of error stems from his subsequent trial and conviction in that county.

The confession signed by defendant was admitted in evidence after an extensive inquiry outside the presence of the jury and we are first confronted with his contentions that its use denied him due process of law because it was involuntarily given, and that he was denied a fair trial when the court unduly restricted evidence by which he sought to establish the involuntary character of the confession.

This court has consistently held that confessions are competent evidence only where voluntarily given and has expressed its condemnation of confessions obtained by methods of coercion as being violative of both section 10 of article II of the Illinois constitution and the recognized application of the due-process clause of the fourteenth amendment to the Federal constitution to confessions obtained in State cases. (See: *People* v. *Sloss,* 412 Ill. 61; *People* v. *Thomlison,* 400 Ill. 555; *People* v. *Crabb,* 372 Ill. 347; *People* v. *Vinci,* 295 Ill. 419; *Fikes* v. *Alabama,* 352 U.S. 191, 1 L. ed. 2d 246; *Leyra* v. *Denno,* 347 U.S. 556, 98 L. ed. 948.) Adverting to these principles, it is defendant's contention that the confession here was not voluntary, and thus not admissible, because it was obtained after his resolution of silence was overborne by illegal detention and an ordeal of endless questioning, accompanied by threats, promises, cajolery and violence, which led him to sign the document without knowing what it was.

The facts developed at the preliminary hearing on the confession show that defendant was placed in a cell in the

Sangamon County jail at 2:00 A.M., Tuesday, November 29, immediately after his arrival from Danville, and that he slept until 6:00 A.M. when, by virtue of jail routine, he was aroused, fed and placed in a common room, or bull pen, where he remained the balance of the day along with six other prisoners. At 5:00 P.M. he was turned over to State investigators, John F. Lynch and Dwight Whitlock, to whom he again expressed his desire and willingness to take a lie detector test. It is agreed that defendant was first taken to a laboratory where he was fingerprinted and voluntarily gave a chemist samples of his blood, pubic hairs and finger-nail scrapings, but the evidence as to what followed is in much conflict.

According to Lynch and Whitlock, defendant remained in their custody from 5:30 P.M. to 8:30 P.M., which period was spent in the laboratory, in asking routine questions necessary to prepare a lie test, and in the preparation of the detector apparatus. Sheriff Ball, it appears, was in and out of the interrogation room, described in the record as a normal office, and interjected questions and accusations from time to time. At 8:30 P.M. Lynch and Whitlock left the building to eat, and Ball went to obtain food for the defendant, leaving the latter in the custody of Kenneth Lindzey, Canton police chief, and the Fulton County State's Attorney. Defendant agreed that these two men did not attempt to question him or discuss the crime but, contrary to the People's witnesses, said the occasion of his being alone with them occurred the following night. When Ball returned, however, we gather that he did attempt to discuss the crime and that defendant reacted with disgust by throwing a sandwich on the table. Defendant said that Ball then became disgusted and returned him to the county jail, but this is difficult to reconcile with his later testimony that he was not returned to the jail until 3:00 A.M.

Lynch and Whitlock testified they returned to the interrogation room at 9:30 P.M. and, except for minor inter-

ruptions, were thereafter alone with defendant until approximately 1:00 A.M., during which time they administered the lie detector test and questioned defendant generally concerning the death of Janice May. In corroboration Lindzey testified he did not see defendant again that night after 9:30, while Ball, who said he returned defendant to the county jail about 2:00 A.M., testified he saw defendant only once between 9:30 P.M. and 1:00 A.M. when he joined those in the interrogation room for a smoke. Defendant denied he was given a lie detector test on that night and represented that he was questioned continuously by Lynch, Whitlock and Ball from 5:30 P.M. to 3:00 A.M. During this time, he stated, he was shown the bloodstained concrete, the underwear shorts and jacket found by the Canton police, which he denied owning, as well as photographs of the scene where Janice was found, in an effort to extract a confession.

The following morning, Wednesday, November 30, defendant was again aroused at 6:00 A.M. and was again placed in the bull pen along with other jail inmates. During the course of the day he was fingerprinted and taken to the Springfield city hall where he participated in a police line-up with his fellow prisoners. After being fed at 4:30 P.M. he was again taken to the State bureau by Ball and, upon arriving there, he testified he saw the State's Attorney, Lindzey, Whitlock, Lynch and Betty Baldwin. The latter it appears, gave a statement to the investigators on this date and was brought into the interrogation room momentarily but had no conversation with defendant, who testified he seized the occasion to exhort her to admit her story was false.

What occurred during the balance of the evening is again in conflict. The substance of defendant's testimony was that, during an unbroken period extending from 5:30 to 11:00 P.M., he was given a lie detector test, then questioned by Lynch, Whitlock, Lindzey and Ball who again

showed him the physical evidence and urged him to confess. After 11:00 P.M., according to defendant, he was questioned only by Lindzey and James Christensen, the latter being the superintendent of the State Bureau of Criminal Investigation, and, at 12:15 A.M., he signed a paper after being told by his questioners he would get the electric chair if he did not sign. As opposed to defendant's version, Lynch and Whitlock testified they alone interrogated defendant between 5:30 and 8:30 P.M., a view substantiated by Lindzey and Ball, and that they left the interrogation room and did not participate further in the questioning after Christensen, their superior, assumed charge at 8:30 P.M.

The substance of Christensen's testimony was that he first met defendant in the interrogation room at 8:30 P.M., Wednesday, November 30, when introduced by Lynch, and that he refrained from questioning until 9:30 to permit defendant to eat some food that was sent for when defendant indicated he was hungry. This was corroborated by Lindzey and Ball but defendant testified he was given nothing to eat until after he signed a paper at 12:15 A.M. Christensen related that he and Lindzey talked to defendant and questioned him until approximately 10:15 P.M. when he admitted his guilt and gave a detailed oral account of how and why he had committed the crime. When this occurred Ball and the State's Attorney were summoned to the interrogation room. The latter left after hearing of defendant's admission but Ball was sent to the laboratory for the bloodstained jacket and underwear shorts. Christensen testified defendant identified the clothing as items he had referred to in his oral statement; defendant, however, testified he denied ownership at all times and informed the interrogators that he wore "boxer" rather than "jockey" type shorts. Thereafter Christensen procured a pad of paper and a pencil and, by a process of requestioning defendant and putting down the questions and answers in longhand, prepared the confession in written form.

Although it is denied by defendant, who testified only that he signed a paper with some writing on it after being told he would get the electric chair if he did not sign, Christensen and Lindzey testified defendant declined to read the confession after it was reduced to writing, whereupon Christensen read it to him, pointing out each line with a pencil as he did so and sitting in a position where defendant could see and follow each line as it was read. When this was concluded at approximately 12:15 A.M. Thursday, December 1, defendant again indicated his willingness to sign the confession and did so by placing his name on the last page and his initials on the preceding pages. Christensen, Lindzey and Ball, who witnessed the signing, likewise affixed their names and initials on the document.

Other evidence in the record reveals that defendant was immediately taken from Springfield to Pekin, arriving in the latter city at 1:30 A.M., where he was lodged in the Tazewell County jail. At Ball's insistence he was examined by a physician, to whom he denied either pain or injury, and, later in the day, he was visited by his parents.

In relating the events which transpired from the time he was arrested in Danville until he was taken to the Tazewell County jail, defendant represented there were many circumstances designed to have a coercive effect on him. Thus he stated that all the officials who dealt with him displayed a harsh and belligerent attitude which was manifested when they shouted at him, cursed him and uttered numerous threats. Such charges were expressly and completely denied by all who had anything to do with his custody and questioning. Similarly, defendant related that he was both promised and threatened by his questioners with confinement in a mental institution; that he was told his parents wanted nothing to do with him, and that he was frequently told he would get the electric chair if he did not admit the crime. Again, all the individuals to whom such threats and promises were attributed, expressly

denied them and received corroboration from other witnesses. After omitting the point on direct examination, defendant testified on cross-examination that an act of physical violence precluded his confession when Ball, while the two were alone in the interrogation room shortly before 11:00 P.M. on November 30, became incensed and struck him on the tip of the shoulder. He testified the blow caused a bruise which he showed to no one, and that he told his parents about being struck when they visited him at the Tazewell County jail. As opposed to defendant's charge, Ball categorically denied he had ever struck defendant and, if the chronology of events on November 30 testified to by Christensen, Lindzey, Ball, Lynch and Whitlock is accepted as true, Ball and defendant were not alone when the incident is supposed to have occurred. In an effort to show further physical mistreatment defendant testified Christensen slapped him continually on his bruised shoulder and had a hard look in his eyes while doing so. Christensen denied this and testified that no threats or promises preceded the confession.

Speaking in *People* v. *Fox*, 319 Ill. 606, at 615-616, this court said that a confession is regarded as voluntary when it is made of the free will and accord of the accused, without fear or any threat of harm, or without promise or inducement by hope of reward. Whether a confession is involuntary is a preliminary question which must be decided by the trial court from evidence heard outside the presence of the jury, and the real question presented to the court is not whether there is evidence of threats or promises, but whether there has been any threat or promise of such a nature that a prisoner would be likely to tell an untruth from fear of threat or hope of profit from the promise. (See: *People* v. *Lazenby*, 403 Ill. 95; 14 I.L.P., Criminal Law, sec. 402.) Thus it has been held that a confession is not rendered inadmissible by the mere fact it was made while in the custody of the police, (*People* v.

*McFarland,* 386 Ill. 122,) or by the fact it was made after the accused was illegally arrested, *(People* v. *Klyczek,* 307 Ill. 150,) or detained without process, *(People* v. *Hall,* 413 Ill. 615,) or because it was elicited by questions put by the police, *(People* v. *Vinci,* 295 Ill. 419,) or came after exhortations to tell the truth. *(People* v. *Lazenby,* 403 Ill. 95.) Upon preliminary inquiry into the voluntary nature of a confession, the question of its competency as evidence is for the trial court, alone, to decide and, in making its decision, the court is not required to be convinced of its voluntary character beyond a reasonable doubt. *(People* v. *Townsend,* 11 Ill.2d 30; *People* v. *Varela,* 405 Ill. 236.) In this respect, where there is no proof of the use of force except the accused's own testimony, the testimony of others present being to the contrary, it is not error to admit a confession into evidence. *(People* v. *Gavurnik,* 2 Ill.2d 190; *People* v. *Tuttle,* 382 Ill. 147.) On review, the decision of the trial court will not be disturbed unless manifestly against the weight of evidence, or unless the court has clearly committed an abuse of discretion. *People* v. *Lindsay,* 412 Ill. 472; *People* v. *Weber,* 401 Ill. 584.

There is here a direct conflict in the testimony bearing upon the character of the confession and, as a consequence, contrary views as to the conclusion to be drawn from all the evidence. The People interpret the record as showing a completely voluntary confession obtained after an orderly process of questioning and investigation by officers of experience and integrity. Defendant, on the other hand, denies he knowingly signed a confession at all and construes the evidence as showing his signature on the document in evidence resulted through fear induced by threats of the electric chair and an aura of violence and hostility surrounding his interrogation. As presented, therefore, the issue of whether defendant signed the confession through fear or hope, and the question raised by his denial that he knew what he was signing, resolves itself almost

completely into a determination of which witnesses were telling the truth. In such a case we are committed to the principle that the trial court, who had the opportunity to see and hear the witnesses, is the one most qualified to judge their credibility. (*Davies* v. *People,* 10 Ill.2d 11; *People* v. *Viti,* 408 Ill. 206.) To us, who view only the printed record, the tenor of all the evidence developed at the preliminary hearing, gives rise to a moral certainty that defendant knew what he was signing and does little to establish that he capitulated through fear, hope or purported emotional upset. The testimony of the officials is not materially inconsistent or inherently improbable, and was unshaken on cross-examination. Defendant's testimony, on the other hand, particularly that relating to the use of threats and physical violence, appears strained and lacks the spontaneity and cohesiveness that would lend to its credibility. Accepting the testimony of the prosecution's witnesses as true, we find no basis to say that the decision of the trial court was against the manifest weight of the evidence insofar as it found the confession was not induced through fear or hope.

Nor do we find merit in the contention that the procedures employed in obtaining the confession exceeded the limits fixed by constitutional standards of due process and fundamental fairness. In seeking to show psychological coercion defendant's counsel represents in argument that he "was pressed and questioned relentlessly for most of the fifty-two hours before he confessed." This is an exaggeration of what is shown in the record. On November 28, the night of his arrest, defendant was questioned for only 45 minutes at the Danville jail, then was not questioned again until approximately 20 hours later in Springfield. In the interim he made a three-hour auto trip from Danville to Springfield and was lodged in the Springfield jail where he was permitted to sleep and rest in accordance with jail routine. On the night of November 29 he was

in the custody of State investigators for a three-hour period lasting from 5:30 to 8:30 P.M., the lateness of the starting hour being controlled by the assigned investigator's absence from the city until 4:30 P.M., and for a second period of three and one-half hours extending from 9:30 P.M. to 1:00 A.M. A portion of the first period was used for laboratory tests and in the preparation of a lie detector test, while a portion of the second period was devoted to the lie detector test defendant said he demanded. Also detracting from the claim that the questioning was oppressive and relentless is testimony that many minor interruptions occurred during both periods, that defendant was permitted to eat and rest between periods, and that he was permitted to smoke as he wished. Following these periods defendant was returned to the county jail where he slept and followed jail routine. At 5:30 P.M. the subsequent night (and it is significant to note that defendant had been accustomed to working from 6:00 P.M. to 6:00 A.M.) he was questioned for three hours by Lynch and Whitlock, permitted to eat and rest for an hour, then was interrogated by Christensen and Lindzey for only 45 minutes before he orally admitted his guilt and indicated his willingness to sign a confession. Up to the time he confessed, therefore, defendant was interrogated on three occasions, separated by periods of approximately 20 and 16 hours, for a total of something less than 11 hours.

Responding to cross-examination which sought to elicit directly wherein he had been wronged and mistreated by his questioners, defendant complained only of frequent accusations of guilt, the alleged blow on his shoulder, profane and harsh language, threats of the electric chair, and stated that the entire process of questioning was a strain on him. Insofar as his emotions are concerned, defendant testified the blow on his shoulder did not upset him and his only other references to his feelings were that he cried after taking the lie detector test and that he became "riled

up" when asked to sign a paper by Christensen. The latter related that defendant was calm and collected until immediately prior to his admission of guilt when he "appeared to be filled up and more or less becoming emotional." Lindzey's version was that defendant's eyes "filled with tears and he told us he took the life of Janice May." Such emotions, it would seem from the record, could be accounted for by defendant's inward consciousness of having committed a murder and of being confronted with evidence of guilt which he could neither explain nor deny, rather than any conduct of his questioners. When we consider that the court and jury rejected the claim of fear through threats and violence, that defendant was not secreted or kept in isolation, that he was not subject to relay questioning, sweat-box or third-degree methods, that he demanded the lie detector phases of his questioning, and that he was given extensive time for rest and reflection between periods of questioning, we find no reason to say that the circumstances here approximate the conditions which led to findings that due process of law had been violated in *Fikes* v. *Alabama*, 352 U.S. 191, 1 L. ed. 2d 246; *People* v. *Thomlison*, 400 Ill. 555; *People* v. *Goldblatt*, 383 Ill. 176; *People* v. *Vinci*, 295 Ill. 419, or other decisions cited to us by the defendant. On the contrary, when the conduct which caused the defendant to become a suspect is considered along with his demand for a lie test, it would appear that the questioning was no more persistent than would be expected in a murder investigation and that the methods employed did not offend what Mr. Justice Frankfurter refers to in the *Fikes case* as "the civilized standards of the Anglo-American world." Cf. *People* v. *Crump*, 12 Ill.2d 402; *People* v. *Townsend*, 11 Ill.2d 30.

Some argument is made that illegal detention and questioning are alone sufficient to render the confession involuntary. We have held, however, that detention without

process does not itself render a confession inadmissible if it was otherwise shown to be voluntary. (*People* v. *Hall,* 413 Ill. 615; *People* v. *Lazenby,* 403 Ill. 95; *People* v. *Viti,* 408 Ill. 206,) and the Supreme Court of the United States has held that such a State rule does not abridge the fourteenth amendment. (*Stein* v. *New York,* 346 U.S. 156, 97 L. ed. 1522.) Apart from this, the facts of the present case show that defendant was being detained under authority of the warrant charging him with the larceny of the taxi, a crime which, in face of Betty Baldwin's communication to the Canton police, had some relation to the murder under investigation.

During the preliminary hearing into the admissibility of the confession the court made several rulings on evidence which now serve as the basis for a claim that the inquiry was so unduly restricted as to deny defendant a fair trial. On one occasion counsel for defendant asked investigator Lynch: "What, other than routine questions, were asked?" and on separate occasions asked Ball and defendant: "What happened after your arrival at the Tazewell County jail?" In all instances the court sustained objections by the prosecution on the grounds of materiality but only after indicating his ruling would be otherwise if the defense could demonstrate how such questions related to the voluntary or involuntary nature of the confession. This the defense did not do. Thus, on the record presented, we find no error in the court's ruling. As a practical matter, the record reveals the limitation on evidence employed by the court was first suggested by the defense and thereafter impartially applied to prosecution and defense alike. The isolated instances complained of, therefore, offer little support to the present claim that the court unfairly and arbitrarily restricted cross-examination by the defendant.

When the prosecution had completed its evidence at the preliminary hearing, defendant's initial move was to make an offer of proof, (to be accomplished through the testi-

mony of family and friends and the opinion of a psychiatrist who examined defendant on two occasions several months after the confession), designed to show that defendant is a completely inadequate emotional personality, that such a person cannot evaluate the consequences of his acts and would, under slightest pressure from interrogating officers holding him in custody, grasp any means offered to him to escape a situation in which he found himself, even to the extent of signing any document demanded of him without regard to its truth or falsity, and without regard to his innocence or guilt. In rejecting this offer the court commented that, in its opinion, neither Illinois procedure nor expanded concepts of due process of law required the preliminary hearing on a confession to extend into the background of apparently normal and mature persons. Accordingly the court limited the inquiry to the time from defendant's arrest until the time he signed the alleged confession. Defendant insists, as he did below, that the exclusion of such evidence was manifestly erroneous.

There neither is, nor can there logically be, a rule of procedure fixing inflexible limits, either as to time or substance, upon what evidence may or may not be material and proper in determining the voluntary character of a confession. The choice must, rather, remain in the discretion of the trial court and be controlled by the circumstances peculiar to each case. (See: 14 I.L.P., Criminal Law, sec. 418.) Thus, in the present case, the only issue raised by the court's refusal is whether the rejected psychiatric evidence was material to defendant's claim that the confession was coerced.

This court has indicated that age, education, experience, strength of intellect, and emotional characteristics are elements to be considered in determining the competency of a confession, (*People* v. *Hall,* 413 Ill. 615; *People* v. *Klyczek,* 307 Ill. 150,) and the Supreme Court of the United States has expressed the view that the allowable

limits of the inquiry by which a confession is secured depends, in any case, "upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." (*Fikes* v. *Alabama,* 352 U.S. 191, 1 L. ed. 2d 246; *Stein* v. *New York,* 346 U.S. 156, 97 L. ed. 1522.) Defendant reads into these judicial expressions an inexorable command that a subjective inquiry must be made before any confession can be found to be voluntary, and proposes that "only the psychiatrist holds the key to a full evaluation of the particular individual." We, however, do not see in these decisions the far-reaching result contended for and observe that, in each case, the subjective determination was made without the benefit of psychiatric evaluation. In the *Stein case* the court said: "This Court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and not coercive." (346 U.S. at 184.) When this language is coupled with the fact that the formula which weighs pressure against the power of resistance can be applied only if pressure existed, it cannot be said that fundamental fairness goes so far as to require a psychiatric probe of every accused who makes a confession. Indeed, in this case, the psychiatric hypothesis proffered by defendant was bottomed completely upon the reaction of an imaginary inadequate person to pressure exerted against him. Yet, when the offer of proof was made, there was no evidence of coercive pressure or unreasonable interrogation and thus no basis or need for a weighing against powers of resistance. Under the circumstances it was neither erroneous nor unfair for the court to refuse the psychiatric proof.

Our conclusion is fortified by subjective evidence gathered from the entire record which shows that defendant was not young, ignorant or timid. He was twenty-nine years old, had finished the second year of high school and some training under the G.I. Bill of Rights, had met the

intelligence requirements needed to enlist in the Army, Coast Guard and Air Force, had traveled extensively, and had wide and varied employment experiences. Nor was he inexperienced in the ways of crime or its detection, for the record shows that he changed his name to escape apprehension by military authorities, that he served a seven-months sentence on a California prison farm for the taking of a bailed automobile, and that he was cautious enough on another occasion to find out if there were any warrants against him in Fulton County before he returned there. It is true that he changed jobs frequently, led a nomadic existence and entered into four hasty marriages, but these factors do not detract from his experiences and manifestations of intellect which show that he could and did appreciate the consequences of his actions.

Continuing his attack on the confession, defendant urges next that the court erred in its ruling on evidence bearing on the credibility of the confession. Where the minor instances complained of find support in the record, we observe that the court did no more than to properly apply the rules of evidence relating to hearsay, self-serving statements and the scope of rebuttal; thus we see no reasonable purpose in minute analysis. Within this point it is also suggested that it was error for the court to deny admission of the expert testimony of a psychiatrist as to his conclusions based upon the facts in the record. We agree with the court, however, that such a determination rested with the jury.

Defendant makes no contention that the proof does not establish his guilt beyond a reasonable doubt but, in support of a contention that the evidence does not sustain the verdict, asserts only that the prosecution failed to prove one element of the *corpus delicti, viz.,* the criminal agency of some person in the death of Janice May. In making that contention defendant erroneously assumes that direct and positive evidence, independent of a confession, is neces-

sary to prove the *corpus delicti*. The true rule is that although a mere, naked confession, uncorroborated by any circumstances inspiring belief in its truth, is insufficient to convict, the *corpus delicti* is not required to be proved by evidence *aliunde* the confession or admissions of the accused. It is not essential that the *corpus delicti* shall be established by evidence other than that which tends to connect the accused with the crime. The same evidence may be used to prove the existence of the crime and the guilt of the defendant. The test is whether the whole evidence proves the facts that a crime was committed and that the accused committed it. (See: *People* v. *Nachowicz,* 340 Ill. 480; *People* v. *Lueder,* 3 Ill.2d 487; 14 I.L.P., Criminal Law, sec. 419.) Under this test, the contention of defendant must fail.

The substance of the confession admitted in evidence is as follows: Defendant arose at 2:30 P.M. on Saturday, November 26, 1955, had a cup of coffee at a restaurant, then set out to see a Mr. Miller, (the owner of an Auto Body Shop located near the May residence,) concerning a car radio. En route he met Janice, who spoke to him, then walked with him to the railroad tracks where they went behind the mine cars in order not to be seen. Defendant molested her, tore her clothes off and started to have intercourse with her. When the child began to scream and cry defendant became hysterical and, when she tried to arise, struck her with his hand and caused her to fall in such a manner that she hit her head on a concrete block. After this defendant "tried to hide the body under a car and also threw a large rock under the car by the body," then ran along the tracks to "a place on Van Buren Court called the Flats'" where he took off and discarded his jockey shorts. From there he went to his room where he changed his trousers, which were bloody, but kept on his gray jacket which also had blood on it. He then went to a cleaning shop where he picked up a pair of trousers and a shirt and

returned again to his room. While there he changed clothes, wrapped up his bloody trousers, shirt and shoes in a newspaper and set out for Van Buren Court to retrieve his bloody shorts. Upon his arrival there the presence of a car caused him to continue down the street, and, after walking several blocks, he threw the bundle of clothing into a passing freight train. Following this he returned to his room, where he stayed until 5:45 P.M., then, after reporting for work, returned in his cab for the gray jacket which he later threw in a creek. The concluding portions of the confession admitted the incriminating conversation with Betty Baldwin and told of the events occurring between defendant's departure from Canton and his apprehension in Danville.

The confession was amply corroborated by other circumstances in evidence. Betty Ellis, a waitress in the restaurant referred to in the confession, testified that defendant had a cup of coffee and a sandwich there between 2:30 and 3:00 P.M. on the day in question. Joyce Hardy, a clerk in the cleaning shop named in the confession, testified that defendant, whom she identified in the court room, came to the shop at 5:15 P.M. on the afternoon of November 26, 1955, and picked up a sack of dry cleaning. As he stood before her at the counter, she observed that his jacket was spattered and streaked with a bright red substance and that his hands had red smudges on them. Joseph McGraw, a bus driver on the route between Pekin and Champaign, and Burl Sutton, manager of the Danville bus station, corroborated details of the confession relating to defendant's flight by bus. Although defendant intimates that the confession is false and that it was composed by the interrogators to fit the facts of which the police had knowledge, we may consider too that it finds corroboration in the 'proof relating to the condition of Janice May's clothing, the discarded underwear and jacket found by the police, the bloodstained concrete found with the body, and

to the recovery of the abandoned taxi at Pekin. Still other independent circumstances inspiring belief in the confession are defendant's precipitate flight from Canton and the prompt notification to the police made by Betty Baldwin when she learned defendant was missing. It is true defendant testified his departure was prompted by threats of his wife to proceed against him for nonsupport and that an effort was made to impeach Betty Baldwin. Finally, in looking to the element of criminal agency, it is not unreasonable to consider the type, number and severity of the wounds suffered by the youthful victim. When all the facts and circumstances are considered, together with the confession, all elements of the *corpus delicti* were established beyond any reasonable doubt.

It is next contended that numerous prejudicial errors were committed during the trial which require a reversal of the conviction. (See: *People* v. *Dukes,* 12 Ill.2d. 334.) Among the instances complained about is the admission of the testimony of Lyle Hedges, a witness for the prosecution, who related that he had seen defendant and his parked taxi near the school yard at 4:00 P.M. on September 23, 1955, that he observed defendant waving his hat and making motions to a little blond-headed girl, and that a man on the school yard shouted at defendant to move on and to let the little girl alone. Prior testimony of Janice May's mother had been that her child was blond, blue-eyed and in the third grade of school. The only objection made to this evidence was that it was too remote in point of time. Closely connected to the foregoing point is a contention that the court erred in refusing to admit in evidence a business record, or dispatcher's sheet, which purportedly reflected the movement of defendant's cab on the afternoon of September 23, 1955. It may be that the trial court erred in his rulings as to these matters, but the proof of guilt was so overwhelming that these errors, in the perspective of the entire record, are without significance.

Defendant testified he had received a dishonorable discharge from the Army, that he thereafter enlisted in the Air Force, from which he was subsequently discharged for a fraudulent enlistment, and that he applied for and received G.I. training. By cross-examination the prosecution brought out that defendant had sworn falsely on both occasions and it is now contended that such cross-examination should not have been permitted. Where an accused takes the stand on his own behalf, he tenders his character and reputation as a direct issue, thus subjecting his credibility to the same tests as applied to any other witness, (See: *People* v. *Johnson,* 333 Ill. 469; *People* v. *Hicks,* 362 Ill. 238; *United States* v. *Skidmore,* 123 F.2d 604,) and the court has wide discretion in determining the propriety of cross-examination tending to reflect on his character. (*People* v. *Halpin,* 276 Ill. 363.) The cross-examination here did not exceed the limits of the direct examination and was clearly material to the issue of defendant's veracity. Cf. *People* v. *Bakutis,* 377 Ill. 386.

It is next urged that the court gave six improper instructions to the jury on behalf of the People and that it erred in refusing to give 12 of the instructions tendered by defendant, seven of which related to the voluntariness of a confession. We see no beneficial purpose in further extending this opinion to detail the facts or present the law applicable to each of the 18 instructions of which complaint is made. A critical examination of the facts, the briefs, and the authorities cited reveals that the given instructions have been tested and approved in the decisions of this court, and that those refused were either repetitious, inapplicable under the facts of the case, or subject to infirmities long established. Reading all the instructions as a series, we do not find that the jury was either inadequately or improperly instructed.

Defendant contends that the State's Attorney made inflammatory and improper remarks to the jury in his argu-

ment when he referred to defendant's dishonorable discharge from the Army and false swearing, when he described and asked the jury to visualize the wounds suffered by the deceased, and when he stated he considered it his duty as the representative of all the people of Fulton County to recommend the death penalty. We do not see in the latter statement an expression of personal opinion such as those condemned in *People* v. *Lettrich*, 413 Ill. 172, and *People* v. *Dabney*, 315 Ill. 320, upon which defendant relies. Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be discountenanced by the courts. (*People* v. *Howe*, 375 Ill. 130.) It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based on competent and pertinent evidence. (*People* v. *Moore*, 9 Ill.2d 224; *People* v. *Stephens*, 6 Ill.2d 257.) Similarly the State's Attorney has a right to dwell on the evil results of crime and to urge fearless administration of the law. (*People* v. *Caylor*, 386 Ill. 501.) On the basis of these decisions, we cannot say that the prosecutor's statements drawn from facts in evidence, or his reference to his responsibilities and duty, transcended legitimate argument.

The record discloses the court entered an order appointing a private counsel to assist the State's Attorney, and defendant now insists that it was without jurisdiction to do so inasmuch as the statutory prerequisites for the appointment of a special prosecutor were not met. (See: Ill. Rev. Stat. 1955, chap. 14, par. 6.) The statute relied upon relates to the procedure to be followed when a State's Attorney is sick, absent or unable to attend, or the office is vacant, and has no application to this case. On the other hand, this court has repeatedly held the trial court is vested with discretion in permitting private counsel to assist a State's Attorney, and that it may do so as fairness and

justice require and without oppression of a defendant. (See: *People* v. *Husband,* 4 Ill.2d 451; *People* v. *Hartenbower,* 283 Ill. 591; *Hayner* v. *People,* 213 Ill. 142.) We find nothing in the present case, which was twice-tried, complex and exhaustively defended by co-counsel for defendant, which shows an abuse of discretion in this respect.

Subsequent to the time a writ of error and *supersedeas* were issued by this court, and 25 days after defendant had been committed to the penitentiary, his counsel filed a supplemental motion for a new trial alleging newly-acquired information that the court had communicated with the jury outside the presence of the defendant. Presented in support thereof was the affidavit of a juror to the effect that she had requested a bailiff to tell the judge "we want more information on the life sentence," and that the judge had sent word by the bailiff that he "could not give any information." The court dismissed such motion and it is now contended that both his ruling and his action of communicating with the jurors command a new trial. Defendant is in error in both respects. Measured in terms of procedure the rules of this court make it manifest that a trial court is without authority to vacate or set aside a judgment once our jurisdiction is invoked by writ of error, and we have expressly held that such power is lost once a defendant has been delivered to prison authorities in execution of a judgment and sentence. *(People* v. *Perlmutter,* 306 Ill. 495; *People ex rel. Lucey* v. *Turney,* 273 Ill. 546.) From a substantive standpoint we know of no rule of law or logic, and none has been suggested to us, justifying a conclusion that a refusal to communicate is a communication. We add too that affidavits of jurors cannot be heard to impeach the verdict on motion for a new trial. See: *People* v. *Brewer,* 355 Ill. 348; *People* v. *Geisler,* 348 Ill. 510; *People* v. *Quinn,* 313 Ill. 351.

Two pre-trial matters which occurred in the circuit court of Fulton County are also urged upon us as denying

defendant a fair trial. The first of these is the court's denial of a motion whereby defendant sought permission to make "a scientific examination" of the physical evidence in the hands of the People. Such a motion, however, is addressed to the sound discretion of the trial court and, upon review, its ruling thereon will not be disturbed unless it is clearly shown that the discretion has been abused. (Cf. *People v. Sims*, 393 Ill. 238; *People v. Diekelmann*, 367 Ill. 372.) The required showing has not been made in this case. Indeed, the proceeding at which the motion was denied has not been preserved in the bill of exceptions, thus we are afforded no basis for review of the discretionary ruling.

On August 9, 1956, during the period between the mistrial in Fulton County and defendant's trial in Hancock County, a contempt citation was filed in the circuit court of Fulton County charging one of defendant's counsel with intimidating the prosecution's witness, Betty Baldwin. A rule was entered for counsel to show cause on September 6, 1956, and on that date, which was four days before the trial commenced in Hancock County, counsel moved to dismiss the contempt citation and for a continuance of the cause against the defendant. Both motions were denied and the contempt citation remained pending during the trial of the defendant. Thereafter, during the trial in Hancock County, defendant moved for continuances on three occasions, and for a mistrial on another, on the theory that prejudice, inspired and revived by newspaper articles concerning the contempt citation, existed against him in that county. The circumstances surrounding the contempt citation have provoked several assignments of error, the first of which is that the constitutional right to be present at a criminal prosecution (Const. of 1870, art. II, sec. 9,) was denied defendant because he was not present at the hearing to show cause. Such an argument is entirely specious. Even if we were to assume the *ex parte* proceeding against coun-

sel was a part of the criminal prosecution contemplated by the constitution, it has been consistently held that the provision does not require the accused to be present at the filing and hearing of motions not involving his substantial rights. *People* v. *DeLisle*, 374 Ill. 437; *People* v. *Kidd*, 357 Ill. 133; See: *Dowdell* v. *United States*, 221 U.S. 325, 55 L. ed. 753.

Nor do we find merit in the contention that continuances should have been allowed or a mistrial declared due to the publication of newspaper articles concerning the contempt citation. Before it can be said that jurors have been influenced by newspaper publications to the extent that they cannot be fair and impartial, facts and circumstances must appear from which it is reasonable to infer that the jurors, or at least some of them, have read the newspaper accounts. (*People* v. *Gambino*, 12 Ill.2d 29; *People* v. *Murawski*, 394 Ill. 236.) This was the standard applied by the trial court and, from our examination of the facts and circumstances in the record, we are satisfied that his ruling was correct.

It is next suggested that the denial of a continuance of this cause operated to deny defendant his constitutional right to effective representation, in that the contempt proceeding caused mental strain and worry to his counsel and provoked the need of dealing with two problems instead of one. We see little merit to this claim in view of the facts which show that the counsel referred to had approximately nine months to prepare for trial, that he had co-counsel who was not under the strain of contempt proceedings, and that the defense was by no means overmatched or unprepared during the course of the trial.

The defendant had a fair and impartial trial in which his rights were guarded and he was aggressively defended. We are unable to say, after a consideration of the record and a critical analysis of the contentions made here, either that there was trial error of a substantial and reversible

character, or that there is any reasonable or well-founded doubt as to the guilt of the accused. The crime he committed was brutal and atrocious. On the evidence therefore, and in the absence of prejudicial error, there is no justification for our interference with the verdict of the jury.

The judgment of the circuit court of Hancock County is affirmed. Accordingly the clerk of this court is directed to enter an order fixing Friday, April 11, 1958, as the date on which the original sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the sheriff of Hancock County.

*Judgment affirmed.*