THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFRED BROOKS, Defendant-Appellant.

First District (6th Division)   No. 1—88—1320

Opinion filed May 17, 1991.

Randolph N. Stone, Public Defender, of Chicago (Thomas M. Donnelly, of State Appellate Defender's Office, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Sally L. Dilgart, and Anne C. Scrivner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Alfred Brooks, was convicted by a jury of the attempted murder of a Chicago police officer, Brian Daly, and was sentenced to six years' imprisonment. He first contends that he was not proved guilty beyond a reasonable doubt.

Lori Clark, Tyrone Clark and Steven Small were all cousins of the defendant. Lori Clark lived with her grandmother, Sadie Brooks, at 5845 South Winchester in Chicago. On January 12, 1987, Lori was in the dining room of her home typing a paper when the defendant and another cousin, Frank Chandler, arrived. Tyrone Clark and Steven Small had been in the living room drinking beer practically all day. Lori and the defendant got into an argument about how Lori's family was spending the money they had received as a result of her mother's death. Lori got up and went into the kitchen. The defendant walked into the living room, where his other cousins were sitting. She could see all four men from the kitchen.

She testified that the defendant, Small, and Tyrone Clark were arguing, and that the defendant tried to pour beer on Small. Small grabbed the defendant's hand, and they got into a tussle. Small pushed the defendant toward some boxes, and the defendant pulled out a handgun from inside his coat. He put the barrel of the gun against Small's head. She went back to the kitchen and dialed 911. She gave her address and told the police that there was an argument and that someone pulled a gun.

She returned to the living room and saw the defendant put the gun back into his coat. Small left the house. The defendant then "started saying things like, 'You see what I'm made of.' " A few seconds later, there was a knock at the door. Chandler asked who it was, and persons on the other side of the door answered, "The police." The defendant ran toward the back door while Chandler opened the front door. Two police officers entered the house, and Lori told them that the defendant had gone out the back door, and that he still had a gun. The two officers ran through the house toward the back door. A couple of seconds passed, and then Lori heard a shot. After a few more seconds, there were two more shots. She did not see who fired the shots, and she could not tell from which direction they came.

Chicago police officers John White, Ron Armata and Brian Daly were assigned to the Seventh District tactical unit on January 12, 1987. They were all in plainclothes and in the same unmarked car. White was driving. At approximately 6:19 p.m., they responded to a

radio call regarding a domestic disturbance and a man with a gun at 5845 South Winchester. They arrived at the house in about one minute.

Daly testified that he knocked on the front door. A female voice inside asked who it was, and the officers responded loudly, "Police." The door opened, and Lori Clark and Chandler were standing inside the doorway. Lori said, "The man's got a gun," and pointed toward the interior of the house. Daly saw the defendant standing in the living room; the defendant looked right at Daly and then ran toward the back of the house. Daly ran down the front stairs and started to go through the north gangway. White saw the defendant running toward the back door. As White approached the back door, he heard Daly shout, "Police, hold it."

Daly testified that the defendant was in the backyard when he swung around and raised his gun with two hands, in a combat stance, and then the defendant fired a shot at Daly. Daly froze for a second; he thought he was getting shot. Then he returned fire once. The defendant spun around and started running. Daly started after him, and he fired two more shots at the defendant.

White testified that when he reached the back door, he saw the defendant standing in the backyard with his hands together. He then saw a muzzle flash come from the end of the defendant's extended arms, and he heard a gunshot; the defendant was holding a gun and shooting in the direction of Daly. White was 20 to 30 feet away from the defendant. There was a pillar between White and the defendant which prevented White from shooting at the defendant. White said he could not see Daly when the defendant pulled the trigger, but he was certain that the defendant was shooting at Daly, because a split second later Daly emerged, firing.

The defendant ran eastward. The three officers chased the defendant, who fell in the snow in a vacant lot. The defendant got up and continued running toward Wolcott Avenue. Daly saw him dive under a porch. Daly yelled to White that he had found the defendant. Daly told the defendant to come out showing his hands. The defendant came out with his hands up and was arrested by Daly and White. They searched the defendant and the immediate area but did not find a gun; however, they did find a black leather holster in the defendant's jacket.

Daly and Armata retraced the steps of the chase to look for a gun. They found the gun lying in the snow in the vacant lot at exactly the spot where the defendant had fallen. Daly picked up the gun by the wooden grips and placed it in the trunk of the squad car. He did

not open the gun or touch the metal surface. When the officers arrived at the police station, one of them removed the gun from the trunk, carrying it by the wooden handgrips. White inventoried the gun, and an evidence technician dusted it for prints. No fingerprints were found on the gun, which contained one spent cartridge and five live rounds.

Ronald Salter, an employee of the Chicago police department's crime detection laboratory, administered a gunshot-residue test to the defendant. He sprayed the defendant's hands with a solution, and then he swabbed them. He then sealed the swabs in cartridges and sent them to the laboratory for further processing.

Salter's partner, Ronald Ferrari, examined the gun found in the vacant lot. He unloaded the gun before he dusted it for prints. He did not see any residue in the cylinder, but he did see residue in the barrel. He testified that residue in the barrel does not indicate when the gun was fired. He said that there is no way to determine whether a gun has been fired recently.

Robert Bertucci, an assistant State's Attorney, testified that he spoke with the defendant at the Seventh District police station on the night of the arrest. The defendant said that the holster he was wearing when he was arrested was for a BB gun that he owned.

The defendant testified that Lori Clark, Steven Small, Tyrone Clark and Frank Chandler were at his grandmother's house at 5845 South Winchester when he arrived. He saw a lot of beer cans, little packages of dope and whiskey in the house. He did not have a gun or a holster with him when he arrived. He talked to Lori about how her family misspent the life insurance money they received when her mother died. They began to argue, and Lori told him to mind his own business. She picked up a typewriter that was in the dining room and took it into the kitchen.

Small also told the defendant to mind his own business, and then Small threw a beer can at the defendant. The defendant tried to dodge the beer can, and he fell onto some boxes. Then Small went into the bedroom and came out with a gun and a holster. Small was in "a raging state" from dope, and he walked toward the defendant, saying, "Get out of here." The defendant grabbed Small's arm, and the two men tussled. The gun and holster fell to the floor. The defendant picked up the gun, and Small tried to get it back from the defendant. Then Small went out the front door. The defendant picked up the holster and put the gun and holster in his pants.

A few minutes later, he heard someone coming up the stairs. He headed toward the back door, because he thought it was Small coming

back to start "problems." He was not aware that Lori had called the police. He went out the back door and started running, because he heard a lot of people and he thought it might be some of Small's friends. No shots were fired at him in the backyard. He first heard shooting behind him when he got to the vacant lot. He dropped the gun and the holster in the vacant lot. He did not fall in the vacant lot. He then continued running, and ended up in a basement. He was down there for about a minute when he heard a lot of people coming around. He was then arrested by the police.

He testified that he never fired the gun. He never spoke with an assistant State's Attorney at the police station. He told a detective that he owned a BB gun, but he did not tell an assistant State's Attorney that the holster was for his BB gun.

The defendant hinges his argument that he was not proved guilty beyond a reasonable doubt on the following: (1) Lori Clark testified that she heard only three shots and that Daly fired three shots; therefore, the defendant could not have fired a shot. (2) Armata was unable to corroborate Daly's testimony that the defendant fired at him. (3) No prints were found on the gun.

■ We judge that none of the aspects of the evidence emphasized by the defendant is of such significance that we must say, as a matter of law, that all the other evidence should not be considered. White testified he heard four gunshots. Armata said that he heard approximately four or five rapid gunshots. A fact finder could reasonably conclude that Lori Clark was mistaken on the number of shots. Considering the frightening nature of the events in which she suddenly had become a participant, any inability on her part to discern the difference between three gunshots and four is understandable.

Armata testified that he followed White going from the front door to the back door and heard shots as he approached the back door. He said there were approximately four or five shots. He saw a muzzle flash from Daly's gun at the time he heard the last shot. At the time he saw the flash from Daly's gun, he saw the defendant standing in the backyard approximately 20 feet away from Daly. At the time Armata saw the defendant, he was turning and running through the gangway toward the alley. Under no circumstances could it be considered that Armata's testimony militated against the testimony of Daly. He did not see the defendant fire a shot, because he was not in a position to see it. The defendant's argument ignores the corroborating testimony of White that he saw a muzzle flash at the end of the defendant's extended arm and heard a gunshot.

We fail to see the significance of the absence of fingerprints on the question of whether the defendant fired the gun. The absence of fingerprints would be probative on the question of whether the gun was ever in the defendant's hand, but his own testimony established that it was in his hand.

Finally, we observe that the defendant makes no attempt to explain the strongly corroborative evidence of the expended cartridge in the gun he admitted having. We judge, therefore, that a fact finder could reasonably conclude that the evidence established the defendant's guilt beyond a reasonable doubt.

The defendant next maintains that the State suppressed information in violation of Supreme Court Rule 412 (107 Ill. 2d R. 412) and deprived him of a fair trial. Before trial the defendant requested the results of the gunshot-residue test that had been given to him by the police. In its written answer to the request, filed on April 22, 1987, the State said that the results of all tests would be made available to the defendant when the State received them. On July 21, 1987, the assistant State's Attorney informed the judge and the defense attorney that he had been informed by the crime detection laboratory that the machine used for the gunshot-residue test was not operating. The defendant's attorney told the court that the results of the test were "all we are waiting for."

At a hearing on September 10, the assistant State's Attorney said that the Chicago police department did not anticipate getting any replacement for the machine for several months. He said that if the defendant cared to hire someone to do it, "that's one thing," but that the police department was not going to do it. The defendant's attorney said that the test results were "absolutely critical" to the defense. The court pointed out that the State was not declining the defendant's request to have the test conducted by whomever the defendant selected.

On October 9 the following occurred:

"THE COURT: Is discovery completed, gentlemen?

STATE'S ATTORNEY: Yes, except for one matter. There was a gunshot-residue test taken on the defendant. I called the crime lab this morning, they still have no instrumentalities. They know of none they recommend in the Chicago area that can perform this type of test.

THE COURT: When do they expect to have it?

STATE'S ATTORNEY: I checked into that. They don't have any expected date, although, as I've said, they requested it and they're just not getting cooperation from their budget depart-

ment or the city budget department, whatever it may be, and they can give me no date on when it will be ready.

DEFENSE ATTORNEY: We would answer ready, judge. There's no way we can really wait any longer.

THE COURT: Do you wish to make a test or have your own expert make a test?

DEFENSE ATTORNEY: Between now and November, the date we're going to ask for, I'll confer and get the availability. There's supposed to be one at IIT which may be available.

THE COURT: I would note one of those tests, the old type, is not admissible into evidence.

DEFENSE ATTORNEY: Right.

STATE'S ATTORNEY: There's some question of the IIT one. I'm aware of that facility."

No gunshot-residue tests were performed by any facility. In spite of that, the defendant's attorney told the jury in his opening statement that a gunshot-residue test was performed by Chicago police department evidence technicians and that the "results are negative." No objection was made to that statement, and the State never referred to it later.

The defendant's attorney's closing argument may be summarized as an attack on the police officers' credibility and the procedures followed by the police. He emphasized that it was the prosecution's burden, not his, to produce evidence. He pointed out the absence of fingerprint evidence and of gunshot residue in the gun cylinder. He branded the testimony that there was residue in the barrel as "nonsense" and an "insult." He deprecated the testimony that the residue-testing machine was broken.

On January 27, 1988, the defendant's attorney filed a post-trial motion in which he alleged that during the trial he was unable to obtain the "necessary expert to conduct the examination since the Federal Bureau of Investigation was not able to process said evidence"; subsequent to the trial he was advised by members of the Chicago police department crime laboratory that, although the tests might not be conducted at its facilities, the State or the "detectives may and often request that the tests be conducted by Dr. Kaistha, Illinois Institute of Technology, *** for a reasonable fee." He concluded that the information should have been available to the State before trial and the knowledge of the test performance was peculiarly within their knowledge and not the defendant's and that the failure to conduct the test resulted in the "suppression of evidence that may have been favorable to the defendant."

On February 11, 1988, at a hearing on the post-trial motion the defendant's attorney indicated that he learned the name of Dr. Kaistha from a conversation he had with a sergeant at the Chicago Police Crime Detection Laboratory. At a later hearing he identified that sergeant as someone who wore a pink shirt and whose name he did not know. The judge ordered that the gunshot-residue swabs taken from the defendant be submitted to Dr. Kaistha.

Dr. Kaistha submitted a report in which he stated that he had analyzed four hand swabs identified as having been taken from the defendant. The results were as follows:

> "[L]ead, barium and antimony levels fall within normal handblank limits. However, this does not preclude the possibility that the subject could have discharged/handled a firearm or been in close proximity of a firearm when it was discharged."

Lead, barium and antimony were identified as components of most gunshot-residue mixtures.

At the final hearing at which the judge denied the post-trial motion, the defendant's attorney conceded that before trial he had made a "reference to an independent examiner at IIT, who had access to the equipment that was necessary for this testing process." He said that it was his decision to proceed to trial without the results of any tests and described his decision as "tactical" and "strategic." He also said the following:

> "[B]ut so long as there's no misunderstanding, the decision made for Alfred Brooks was a conscious decision to try this case to this jury on a conspiracy theory of the Chicago Police Department, adopting all of the matters which would be in my opinion consistent with that theory, and of primary import was the existence of the evidence in the Police Department Crime Lab. That is to say, Mr. Brooks' swabbings from the evidence technician and their consistent or their pattern behavior, that is to say the Police Department pattern behavior of not filing reasonable grounds to test the results of those swabs to see whether or not there was residue of gunshot."

It was his position that the defendant should not be penalized because of the decision that he, the defense attorney, made.

■■ ■ The defendant argues that the State suppressed evidence that the State or the police used Dr. Kaistha's facility for gunshot-residue testing. We must reject the defendant's argument for a number of reasons. First, a "tactical" or "strategic" decision made by an attorney is binding on the defendant. (*People v. Whitfield* (1968), 40 Ill. 2d 308, 239 N.E.2d 850.) The rule should be excepted when the tacti-

cal decision may amount to ineffective assistance of counsel, but that is not the case here. We believe the tactical decision made by the defendant's attorney to be a sound one under the circumstances, as his argument to the jury illustrated. The police testimony provided him with considerable material with which to attack the State's case. The officer who testified that he detected residue in the barrel never noted that in his police report. Officer Daly testified that he surrendered to the crime laboratory his gun with the three live rounds and the three spent cartridges that were in the gun. He later retrieved the gun, the live shells and spent cartridges, but the inventory sheet of the crime laboratory showed the return of only the gun. The lieutenant in charge of the crime laboratory indicated that a breach of security or a "mistake" might have occurred. The defendant's attorney emphasized the shortcomings in the police procedures and, as noted, challenged the testimony that the machine was broken. In our judgment, the absence of the equivocal results of Dr. Kaistha's test militated in favor of the defendant. The report pointedly excluded a finding that the defendant could not have fired a shot. The inference to be drawn from the report is that he could have fired a shot. The report would have refuted the remark made in the opening statement by the defendant's attorney that the test results were "negative." Consequently, we judge that the defendant was not prejudiced by the decision to proceed to trial without the tests, and he is bound by that decision.

We also believe that there has been no suppression of any information that "tends to negate the guilt of the defendant," contrary to Rule 412(c). To begin, there is a complete absence of any "suppression" of information by the State. Moreover, we repeat, the Kaistha report could arguably be considered more harmful to the defendant's position than its absence. Nor do we find any violation of the State's duty to "insure that a flow of information" was maintained between the State and the Chicago police department as required by Rule 412(f). The record established that the State and the defendant were aware of the IIT facility before trial.

In *People v. Hambrick* (1979), 68 Ill. App. 3d 447, 386 N.E.2d 455, the defendant argued that he was prejudiced by the State's failure to disclose a receipt allegedly signed by him; he claimed that his theory of defense might have been different if the State had disclosed the receipt. The court held that, although the State violated Supreme Court Rule 412, the defendant was not prejudiced, because he knew of the existence of the receipt before trial, and he answered ready for trial before he received the State's answer to discovery. The facts of

this case are even stronger than *Hambrick*, because there was no violation of Supreme Court Rule 412. The defendant knew of the existence of the IIT facility, and he made a conscious decision to go to trial without submitting the material to testing. For these reasons, we find no violation of Supreme Court Rule 412 or the requirements of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

■ The defendant next argues that the cumulative effect of improper investigative procedures combined to deny him due process. The defendant maintains that the State made errors by losing track of the spent cartridge casings from Daly's gun; by failure to properly preserve fingerprint evidence; and by allegedly contaminating the gun found in the vacant lot by dusting it before "documenting" the gunshot residue of the gun. We disagree. The three spent cartridges from Daly's gun were returned to Daly after the gun was examined by the evidence and recovery property section of the crime laboratory. He then stored the spent cartridges in his jewelry box in his home until he was asked to produce them for trial. When he found the gun in the vacant lot, Daly picked it up by holding the wooden hand-grips. He testified that he picked it up in that manner because he did not want to ruin any fingerprints on the metal surface of the gun. We repeat the observation that, since the defendant testified that he held the gun, we see no significance in the absence of fingerprints.

Officer Ferrari testified that he saw residue in the barrel and that dusting the gun for fingerprints would preclude any further examination to determine whether there was gunshot residue in the barrel or the cylinder of a gun. However, he further testified that there was no reason to check the gun for residue, because that would not indicate *when* the gun was fired. He knew of no test that could be performed on a gun that would indicate when the gun had been fired.

■ Failure to preserve potentially useful evidence does not amount to a constitutional violation of due process absent a showing of bad faith. (*Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333.) Nothing in the record indicates that the police department evidence technicians acted in bad faith. The case cited by the defendant, *Ex parte Brandley* (Tex. Crim. App. 1989), 781 S.W.2d 886, is not in point. In *Brandley*, the State refused to perform scientific tests; the State's case was entirely circumstantial. *Brandley* expressly noted that "State misconduct is more likely to affect the outcome of [a] trial based upon circumstantial evidence than one in which there is direct evidence, untainted by State misconduct, linking a defendant to the crime." (781 S.W.2d at 892.) In this case, the

defendant's conviction was based on the direct evidence of at least two eyewitnesses.

The defendant's last argument is that the prosecutor made inflammatory and prejudicial remarks during closing argument that deprived him of a fair trial.

We note first that an objection was made to only two of the remarks, and we will address them first. Although we believe the defendant has waived any objection to the other remarks, we will address them also.

▮▮ The prosecutor said the following about the police officers:

> "[T]hank God they go there. Thank God they had the courage to go to the job so we don't have to. They have their lives on the line. They go into a house where they know a guy's got a gun *** These are brave officers doing their job. You know an officer was just killed two weeks ago."

An objection was immediately sustained. The judge told the jury that there was no evidence in the record about an officer being killed and instructed them to disregard the remark. That comment about another officer being killed was clearly improper; however, the judge's ruling and instruction to the jury operated to cure any error. (*People v. Cox* (1979), 71 Ill. App. 3d 850, 389 N.E.2d 1238.) That single, isolated remark does not mandate reversal absent a clear showing of substantial prejudice. (*People v. Bracey* (1981), 93 Ill. App. 3d 864, 417 N.E.2d 1029.) There has been no clear showing of substantial prejudice.

▮▮ With respect to the other part of the prosecutor's remark concerning the courage and duties of the police officers, we find no error. Unlike the case cited by the defendant, *People v. Threadgill* (1988), 166 Ill. App. 3d 643, 520 N.E.2d 86, the remarks in this case were an invited response to the argument of the defendant's attorney, who told the jury that the police officers were "liars"; as he later admitted, he was attempting to convince the jury that the police officers conspired against the defendant. In addition, the defendant's attorney told the jury that they might be "earmarked as [they drove] down the street" and "some cop might know that [they] were on the jury." An objection by the State was sustained, but the inflammatory nature of the remark is evident. Under the circumstances, we find no prejudice in the prosecutor's remark concerning the courage and duties of the Chicago police officers.

The other argument to which an objection was made occurred during the following remarks of the prosecutor:

"Ladies and gentlemen, then [the defendant] said that he heard some noises on the front porch, and he said he thought Steve and these gang members, he just threw them in there. Why did he throw that in there? To muddy up Steven Small. If we could have had those witnesses here, we would have."

The court sustained the defendant's objection.

The State maintains that the remarks were invited by the argument in which the defendant's attorney said this:

"Would you state your name? Is it Mr. Clark; Michael Clark? Michael, where [sic] you present in the house that day, Michael? Michael, I can't hear you.

Steven Small. State your name please. Tyrone. Is it Tyrone Clark? What did you see that day? Lori Clark says you were there. Frank Chandler. *Where are they?*

*Oh, says the State, we have been looking for them.* Have you heard one piece of evidence?" (Emphasis added.)

■ It is clear that the defendant's attorney was inviting a response by the prosecutor to explain why those witnesses were not called. That being so, the only question before us is whether the record justified the prosecutor's explanation of their absence. We have not combed the record, but we believe that the defendant's attorney's own statement lends support to the State's explanation; it is apparently somewhere in the record that the State attempted to find the witnesses. Considering the relationship between those witnesses and the defendant, it is a fair inference that they were reluctant to testify. In any event, that remark, to which an objection was sustained, does not rise to the level of reversible error.

■ The defendant claims error in the following remarks of the prosecutor:

"He [the defendant] knew the police were following him. That's why he threw the gun. A criminal—you got to understand how a criminal mind works. He gets rid of the evidence. He gets rid of the evidence."

A prosecutor may reflect upon a defendant unfavorably and comment on his actions, provided there is competent and pertinent evidence in the record. (*People v. Miller* (1958), 13 Ill. 2d 84, 148 N.E.2d 455.) The evidence supported the remark. The testimony of Daly and White established that the defendant was a "criminal," that is, he had committed a crime. We do not interpret the prosecutor's remark to be, as the defendant argues, an assertion that the defendant had committed other crimes.

■■ The defendant claims that error occurred when the prosecutor told the jury that the defendant had lied and that Daly had told the truth. We find no error in those statements. The issue should not be clouded by undue reliance on cases involving a prosecutor's expression of his personal opinion about the credibility of the witnesses. This is not such a case. (*Cf. People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756 (prosecutor's remark that he believed defendant and his witness lied under oath was improper but not prejudicial error); but see *People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174, 182, in which the supreme court said, "A prosecutor may state his *opinion* that a defendant is lying if the statement is based on the evidence." (Emphasis added.)) The defendant's testimony was contrary to the testimony of the three officers, his cousin, Lori Clark, and the assistant State's Attorney. Therefore, we conclude that the prosecutor's statement was based on the evidence. (See *People v. Sawczenko* (1989), 180 Ill. App. 3d 406, 535 N.E.2d 1105; *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 431 N.E.2d 1154.) On that basis, we distinguish the case cited by the defendant, *People v. Strange* (1984), 125 Ill. App. 3d 43, 465 N.E.2d 616, in which the court held it was reversible error to call the defendant a "liar" in argument, because the defendant's testimony was not inconsistent with that of any other witness.

■■ In like vein, we see no error in a prosecutor arguing to a jury that a witness told the truth. That conclusion is even more compelled when the statement is in response to a defense argument. (See *People v. Wilson* (1984), 123 Ill. App. 3d 798, 463 N.E.2d 890.) The defendant's attorney told the jury that the police officers were "liars."

In sum, we conclude that no prejudicial error occurred during the State's closing argument.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.