THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICKY IRBY, SR., Defendant-Appellant.

Second District   No. 2—90—0739

Opinion filed October 22,1992.

G. Joseph Weller, Barbara R. Paschen, and Paul Alexander Rogers, all of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a bench trial in the circuit court of Lake County, defendant, Ricky Irby, Sr., was found guilty of the murder of his son, Quinten Irby. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2).) He was sentenced to an extended term of 80 years' imprisonment. Defendant raises the following issues on appeal: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether he was denied due process of law where the State introduced expert testimony on physical evidence that was lost prior to trial; (3) whether the trial court erred by not drawing a negative inference from the State's failure to call Sheila Smith; and (4) whether the sentence is excessive.

On May 31, 1984, three-month-old Quinten Irby suffered severe injuries to his face, mouth, esophagus, trachea and lungs as the result of being force-fed a caustic substance while in the care of his mother, Sheila Smith. Quinten remained in Children's Memorial Hospital (Children's Memorial) for 27 months where he was treated for various

problems stemming from those injuries and died as a result therefrom on August 26, 1986.

Defendant, who was Quinten's father, and Sheila Smith (Sheila) were indicted for first degree murder, later amended to murder, on May 31, 1989. Separate counsel was appointed for defendant and Sheila. Defendant filed several motions to dismiss and motions *in limine*. Defendant sought to prevent the State from introducing evidence or testimony relating to chemical testing of certain physical evidence, which was lost by the State. An open can of baby formula, an unopened can of baby formula, a baby bottle, sink traps from Sheila's residence, defendant's pants, a piece of fabric from defendant's father's car, and testing data were lost sometime between September 1984 and January 1985. Defendant's motions were denied.

Defendant was tried for murder on the basis of accountability. It was the State's theory that defendant aided Sheila in injuring Quinten to obtain a financial settlement from the manufacturer of the formula by blaming the cause of the injuries on the formula. Through a stipulated exhibit, it was established that defendant, as special administrator of Quinten's estate, filed a civil lawsuit for wrongful death against the manufacturer of the formula, Ross Laboratories, a subsidiary of Abbott Laboratories, on August 18, 1987. The lawsuit was voluntarily dismissed by defendant on July 18, 1988.

In May 1984 defendant, then 24 years old, and Sheila, 23 years old, had two children, Ricky, Jr., born in 1980 and Quinten born in February 1984. While defendant and Sheila once shared an apartment, defendant had moved in with his parents in North Chicago a few months before this incident. Sheila and the two children resided at Sheila's mother's house a few blocks from defendant.

Tinnie Smith, Sheila's mother, testified that Sheila was out of formula and purchased a can on the night of May 30, 1984. Sheila fed Quinten about 7:30 p.m., and he was fine. There were several baby bottles in a cabinet. Tinnie said there were cans of formula that "had a little bit open." The open can of formula that Sheila fed Quinten from on May 30 was placed in the refrigerator. Tinnie was not home when Quinten became sick. While at the hospital, she observed that Sheila was upset and crying. When Tinnie got home from the hospital, she did not recall seeing any bottles around the house.

Sheila's brother, Alvin Ray Smith, lived in Tinnie Smith's house. Sometime before 8 a.m. on May 31, 1984, Sheila asked Alvin to hold Quinten while she got a bottle. Quinten appeared fine. After Alvin went downstairs to his room, Sheila screamed for him. He observed Quinten vomiting but thought the baby was too full.

Several witnesses testified that Sheila indicated that Quinten was vomiting on the morning of May 31, 1984. However, the paramedic, a nurse at St. Therese Medical Center (St. Therese), and police officers who inspected the house found no evidence of vomiting on Quinten's clothing or the furniture.

A paramedic who responded to Sheila's call found what appeared to be chemical burns around Quinten's mouth, chin and neck. He said Sheila was totally calm and callous while the woman with her was excited and concerned.

A St. Therese Medical Center nurse, Mariann Hannas, testified that the bottle had a small amount of clear liquid covering the bottom, and she detected no odor from it. There was nothing wrong with the nipple. The open can of formula was black around the openings and the top which she described as corroded.

Mariann Carlton, a nurse at St. Therese, spoke with Sheila in the emergency room. Sheila told Carlton that she put Quinten on the sofa while she went in the kitchen to prepare a bottle. The only other person present was Sheila's three-year-old son. Upon returning to Quinten, Sheila said he had trouble breathing and had injuries to his mouth.

Carlton said that when defendant arrived at the emergency room, she told him that Quinten was injured and the hospital needed to know what happened. Defendant said it had to be the formula and that he was going to sue Abbott Labs. He repeated that it had to be the formula. Carlton told defendant that the hospital needed to know what caused the injuries, and defendant left to retrieve any items. He returned with a baby bottle and a can of formula. She could not recall any other items defendant brought back.

The police report of Carlton's June 25, 1984, statement to Officer Robert Witkowski did not include defendant's remark about the formula. Carlton indicated she told the police this information. Witkowski later testified on cross-examination that he did not recall Carlton telling him about defendant's formula remark and that he would have put it in his report if she had.

Carlton testified that the can of formula defendant returned with had a dusty, dirty lid and the inside smelled "tainted," unlike merely spoiled formula. The lid was already open with two triangular holes. She did not recall how much formula was in the can, but the police report indicated that she found very little. The baby bottle did not contain any formula but had a film-like substance like old baby formula on the sides. It also smelled tainted.

Sheila's older sister, Willie Bea Smith, testified that she was at her home when she received a call from Sheila about 8:30 a.m. on May 31, 1984. Sheila indicated Quinten was sick. When Willie Bea arrived at Sheila's about 10 minutes later, the ambulance was already there. Sheila was upset and crying, but Willie Bea did not speak to her at that time.

Willie Bea left St. Therese when she heard that Quinten was being moved to Children's Memorial. She had not heard any conversations about Quinten's injuries. Willie Bea left her mother and Sheila at the hospital although they did not have their own transportation. She explained, however, that when she left, Quinten had not yet been moved to Children's Memorial.

Willie Bea said there was no reason why she went to Sheila's house. She knew defendant was going there because he told her that the hospital sent him to get the formula. Willie Bea said defendant did not need a ride and did not need assistance to enter the house.

At Sheila's house Willie Bea found an open can of formula in the refrigerator. She did not observe any other cans of formula. She took the open can to the kitchen sink and poured a small amount of liquid down the drain "to see how it looked." She described the can as "quite full," "almost a full can," more than or half full, but later said it was more than one-half full. The top of the can was clean. The formula looked and smelled normal. She then gave the can to defendant; he did not grab it from her. During his testimony defendant said the formula looked normal when Willie Bea poured it down the sink. It also looked normal when it spilled on the car seat.

Dr. Michael Oster, the emergency-room physician who treated Quinten at St. Therese, explained that the burns were caused by a strong acid or chemical applied within about an hour of the injury. Anywhere from 15 to 30 c.c.'s of the substance would have been necessary to cause the injuries. Quinten would not have voluntarily consumed the substance due to an immediate reaction to it. The substance was adeptly administered to the mouth due to the lack of burns elsewhere on the body. Oster opined that this could have been accomplished with something like a kitchen baster or poured directly from a baby bottle. Dr. Carol Gerson of Children's Memorial was of a similar opinion as Oster. Oster did not recall speaking directly to defendant that day. Oster said he told a nurse to send the police to the house to look for something that may have caused the injuries. However, on June 19, 1984, Oster told Officer Witkowski that Oster told defendant to go home and look for anything which contained acid or alkaline to which the baby had access.

A nurse at Children's Memorial, Cindy Etzler, spoke with defendant and Sheila on May 31, 1984, and June 1, 1984. Defendant indicated on May 31 that he suspected a problem with the formula due to the damage to his pants. Etzler did not recall noticing any damage. One of the parents mentioned another, yet unopened can of formula that was purchased with the other can. She asked that anything relating to the injuries be brought to the hospital. Defendant brought the pants and the unopened can to her on June 1, 1984. Etzler said that Sheila rarely cried and defendant did not show much emotion or concern.

Barbara White, a social worker at Children's Memorial, spoke with Sheila and defendant on June 1, 1984. Sheila told her virtually the same version of events that Carlton reported. Defendant repeatedly said there was something wrong with the formula, but Sheila said the formula was fine. Defendant told White about the incident of spilling the formula in the car. Sheila eventually said the formula caused the injuries. There was no reaction from either parent when White told them that there would be an investigation by the Department of Children and Family Services (DCFS). White also observed that throughout the interview there was no emotion shown by the parents.

North Chicago police officers Eugene Williams and Dirk Philipp were dispatched separately to Sheila's residence to search for chemical substances that a three-year-old (defendant's son) could have obtained. Williams arrived about 10 a.m. on May 31, 1984, and spoke to defendant briefly. Willie Bea was in the house too. Defendant told him that defendant had searched the house for chemical substances and found nothing that Ricky, Jr., could have gotten into. Defendant did not interfere with the search. The officers took an almost empty bottle of lighter fluid from the house. Neither officer found any cleaning materials, towels or rags in the house; however, they did not go in the basement. There was no evidence of a bottle preparation in the kitchen, and they did not see any bottles.

Illinois State Police Officer Witkowski testified regarding defendant's statement made on June 25, 1984. Defendant told the police that his baby suffered the injuries from something in the formula and Abbott Labs was going to pay for his baby for the rest of his life. Defendant indicated that he received a call from Sheila about 9 a.m. on May 31, 1984, telling him that Quinten was sick. He borrowed his father's car, drove to Sheila's residence, and then went to the hospital. Personnel there told him to return to Sheila's and look for any items that may contain acid or alkaline. Defendant took the bottle,

open can of formula, Quinten's cough medicine and a container of vinegar from Sheila's and brought it to the hospital. He said Willie Bea tried to pour the formula down the kitchen sink when defendant grabbed the can from her.

En route to the hospital, the can spilled on the front seat. Defendant wiped the area with a wet cloth. About 1:30 p.m. defendant returned the car to his father, and defendant sat in the area where the can spilled when his father drove him back to St. Therese.

Children's Memorial wanted an unopened can of formula, and personnel asked defendant to go get it at Sheila's. Defendant stopped at his parents and discovered a hole in his pants which he said came from the formula on the car seat. He changed and put the pants in the car. Then he took an unopened can of formula from Sheila's.

Defendant said he went to work that night at Future Disco from 9 p.m. to 2 a.m. and went to the Children's Memorial, where he turned over his pants and the unopened formula. Defendant and Sheila stayed at the hospital throughout the night.

Defendant said that on the night before the incident he was fishing at Grass Lake and had not been to Sheila's. He had recently bought a new Chevy Camaro with proceeds from a civil settlement in a different lawsuit. Defendant said Sheila hired an attorney the day after the incident, and they would be suing Abbott Labs.

Drs. Carol Gerson and Zehava Noah treated Quinten during his long stay at Children's Memorial. His injuries became worse over time. He had multiple surgical procedures to remove inflammatory tissue and scarring from his airway. His right lung was removed due to aspirating acid. He was ventilated through a tracheotomy and fed with a tube to his stomach. Quinten's brain and heart were also affected. An autopsy showed that Quinten died as a result of the chemical/acidic injury of May 31, 1984.

Quality assurance personnel from the manufacturer of the baby formula testified. It was shown that in order to contaminate the formula during production, an entire batch of 60,000 cans would have to be tainted. There was no evidence of contamination at the source. The baby formula with iron, like the cans involved here, would contain ferrous, and not ferric, iron.

Testimony showed that defendant was employed for American Motors/Renault manufacturers (now Chrysler Corporation) from September 4, 1979, until December 21, 1979. He started there again on October 18, 1983, and was laid off on January 10, 1984. Defendant was called back to work on June 11, 1984.

Defendant's mother corroborated the fact that defendant used his father's car on May 31, 1984, and that defendant went to work that night. Defendant's father, Willie Irby, testified that defendant returned the car before noon on May 31. He said there was no stain on the bench seat until defendant borrowed the car. The stain was almost in the middle of the seat, near the armrest.

North Chicago police officer Donald Owens removed the stained fabric from Willie Irby's car on June 4, 1984. He cut out the entire area of the stain which was about 2 by 5 inches. The spill was on both sides of the armrest if it were lowered. Officer David Williams said the fabric was removed from almost the center of the seat.

Dr. Douglas Lewis, a toxicologist at Children's Memorial, tested some of the physical evidence on May 31 and June 1, 1984. The open can of formula contained about an ounce of liquid which separated into a watery material on top and curds on the bottom. He used a pipette to remove a sample and found it extremely acidic. The bottle had a very small amount of liquid which tested negative for drugs as did the formula. The gastric aspirant taken from Quinten was highly acidic which was not unusual. It was not tested for the presence of formula. However, Quinten's bronchial secretions were highly acidic which was unusual.

Lewis took a sample of the clear material from the open can and sent it to Hazelton Labs in Madison, Wisconsin. A chemist with Hazelton, Darryl Sullivan, testified that there was an unusually high level of sulfate in the material, but he did not state the amount by volume. Lewis said the Wisconsin lab found "3 molar" or 20% by volume of sulfate. The gastric aspirant was not tested for formula at that lab.

Dr. Joerg Pirl, a toxicologist with the Department of Public Health, began tests on the evidence on June 6, 1984. The open can of formula had visible corrosion around the triangular openings on the top and sides. Its contents were noticeably coagulated and curdled. Sulfuric acid would curdle immediately upon contact with another substance. He found 2.9 normal or 8% concentrated sulfuric acid by volume in the open can. The formula had several more times the amount of ferric iron than the formula from the second can (initially unopened can). However, Pirl explained that the iron in the open can was being produced by the corrosion of the can from the acid. He admitted his iron test was semiquantitative at best and somewhat subjective, and he tested for ferric and not ferrous iron.

Pirl extracted the remaining amount of liquid from the bottle. It showed 2.5% concentration by volume of sulfuric acid. It was negative

for ferric iron. Since the levels were different, Pirl opined that the liquid in the bottle did not come from the can.

The material from the car seat tested positive for sulfuric acid but virtually negative for iron. He also tested the damaged area of defendant's pants and found it mildly acidic. After a series of tests on the pants, Pirl concluded that the contents of the open can could not cause the damage.

Pirl found no sulfuric acid in the lighter fluid, vinegar, cough medicine or sink traps. Any acid in the traps would have been flushed away by running water. Pirl last saw the physical evidence and file data in his supervisor's office, where he left it in September 1984. In January 1985 he discovered it was lost.

Christopher Lageotakes testified that he was a jail inmate with defendant in August 1989. Lageotakes had been charged with aggravated battery at the time. He subsequently was found guilty of battery and was serving a four-year prison term in a downstate penitentiary. He had convictions in Arkansas for forgery, burglary and theft. A theft charge had been dismissed when he was found guilty of battery.

Lageotakes, defendant, and another inmate, Robert Melock, were discussing their cases in August 1989. Defendant said that he paid off someone to lose the evidence in his case. Defendant told Lageotakes that defendant wanted money to start a business with unnamed friends so he devised a plan to get money from Abbott Labs by hurting Quinten with acid. Defendant had discussed the plan with his girlfriend about a month before the incident. Defendant obtained the "rare" acid from someone he knew from school who got it from a lab. Before defendant went fishing on May 30, 1984, he went to his girlfriend's house and switched a tainted can of formula or bottle, Lageotakes was not certain which, for an untainted one. Defendant said his girlfriend's sister was there. Defendant went to his family's house after fishing. Defendant told Lageotakes that defendant was at his mother's house when he learned Quinten was injured. Defendant said his attorney had evidence that defendant was not trying to launder money because defendant had put down $5,000 on a new Chevy Camaro. Defendant's lawyer had advised defendant to drop the lawsuit against Abbott, and defendant said he had dismissed it.

During cross-examination Lageotakes admitted sending a letter to the State's Attorney about two weeks before his testimony. He wanted to negotiate a deal whereby he would be transferred to another institution in exchange for this information, but no deal was made. He still wanted to be transferred and said a transfer was im-

portant to him. He admitted defendant's case was in the press, and he had access to newspapers while incarcerated. Lageotakes had visitors in jail. The State's Attorney came to interview him at prison and expressly told him there would be no deal for his cooperation. Lageotakes denied being threatened with obstruction of justice charges if he refused to testify although a lawyer told him he would have to testify since he gave a statement. Lageotakes said he did not expect anything for his testimony. During post-trial proceedings, defendant showed Lageotakes was transferred to another institution, but the transfer could not be linked to this case.

After the State rested, defendant's motion for a directed finding was denied. Donna McGrath testified for the defense. She was a nurse at St. Therese on May 31, 1984. In observing the open can of formula at that time, she said the top of the can was corroded and pitted, "whitish" in color. There was not much material in the bottle.

The defense was going to call Robert Melock, the inmate Lageotakes said was present during defendant's admissions. Since Melock was going to take the fifth amendment, the parties agreed to a stipulation. The stipulation provided that Melock would testify that the conversation with defendant and Lageotakes did not take place in his presence; Melock was biased against the State and perhaps the prosecutor in particular; and it would be adverse to his interests to admit the conversation took place.

Defendant's cousins Lynn Epps, Lynn's father Arthur Epps, and Lynn's nephew Shane Formel testified about the fishing trip to Grass Lake with defendant on May 30, 1984. Defendant and Lynn left Lynn's place of employment about 4:30 p.m. on May 30, 1984, in Peter Custer's van. They stopped at defendant's house and then Lynn's. Defendant wanted some food stamps for snacks so they went to Sheila's house. Defendant was wearing blue jeans and a T-shirt and carried nothing in his hands when he went inside. As defendant left the house about five minutes later, Sheila and defendant had words. Defendant and Lynn picked up Arthur and Shane, and they went to the lake. They left the lake about 2:30 a.m., and defendant was dropped off at his house. Defendant borrowed Peter's orange Mazda on May 31 to go to the hospital.

Joel Brodsky, an attorney, testified that Sheila came to his office on June 2, 1984, regarding a products liability action arising out of the tainted formula she gave to Quinten. Sheila was referred to Brodsky by a hospital employee. She signed a retainer but defendant did not.

Brodsky referred the case to John Navigato's office. Navigato testified that his firm represented Sheila and perhaps defendant in a DCFS action in 1984. Navigato filed the formula lawsuit on August 18, 1987. Prior to suit defendant was appointed special administrator of Quinten's estate and named as the plaintiff in the suit. Defendant was chosen because of the common surname with Quinten. Defendant did not sign a retainer. Navigato had no knowledge of his firm advising Sheila to file a paternity action against defendant or advising defendant to admit paternity in order to be named as the special administrator. The court later took judicial notice that on September 23, 1986, defendant admitted paternity of Quinten.

Dinah White, a child welfare supervisor with DCFS, interviewed Sheila about 3 p.m. on June 1, 1984. Sheila said Quinten vomited a green and yellow liquid on May 31, which Sheila knew was acid based on her schooling. White interviewed defendant at 2:30 p.m. on June 1, and he said he believed there was something in the formula. He told White about damaging his pants as a result of sitting where the formula spilled.

Defendant testified on his own behalf. About 4:30 p.m. on May 30, 1984, defendant and Lynn Epps borrowed a van from "Pete" to go fishing. They stopped briefly at Sheila's for food stamps, but Sheila was upset and had words with defendant. Lynn and defendant were then joined by Arthur and Shane at Lynn's house. They arrived at Grass Lake about 7 p.m., and defendant was home about 3:15 a.m. on May 31. Defendant's father testified that defendant came home about 1:30 a.m. Defendant had stopped by Sheila's house in the morning of May 30, 1984, but did not go inside.

On May 31 Sheila called defendant and said Quinten was vomiting and asked defendant to take Quinten to the hospital. Defendant borrowed his father's car because his car's brakes were bad. During a deposition taken on June 21, 1988, in the civil lawsuit against Ross Labs (Abbott), defendant said his car was filled with fish. At Sheila's house, defendant was told Quinten and Sheila were already at the hospital. Upon defendant's arrival at St. Therese, Sheila did not know what happened to Quinten, but that he was "vomiting and stuff."

According to defendant, a nurse and a doctor asked him to retrieve anything Quinten may have eaten and any acidic or alkaline substances from Sheila's house. No one mentioned anything to defendant about Quinten having had any formula. Defendant went to Sheila's where he read labels on various items to see if they were acidic or alkaline. He found a baby bottle in the living room. In the kitchen he found Willie Bea pouring a can of formula down the drain.

He asked her what she was doing and she made no response. During the 1988 deposition, defendant said Willie Bea said "oops" and put the can on the counter. At trial defendant said he grabbed the can from Sheila. Defendant did not see any other bottles, formula or baby food. He took a jar later identified as vinegar, cough medicine, the open can of formula and the bottle. He spoke with police outside but defendant could not recall what was said. On the way to St. Therese, defendant nearly collided with another car, and the can spilled on the front seat.

Defendant brought the car home about noon because his father had to go to work. He denied saying that he was going to sue Abbott Labs during the time he was at St. Therese.

At his parents' house, defendant wiped the seat where the formula spilled. His hand was not burned. His father drove him back to St. Therese. Defendant sat partially in the area of the spill. Later, defendant borrowed a car from "Pete" (Pete Custer) in order to get to Children's Memorial. In defendant's 1988 deposition he said he drove his car to Children's Memorial and denied using Pete's. At trial, defendant said he did not know Pete's name at the deposition.

About 8 p.m. while in the waiting room at Children's Memorial, defendant felt a sensation on his leg and noticed a small rip on the side of his pants. Defendant realized the rip was in the area where he partially sat on the formula spill. He told Sheila there must have been something wrong with the formula. Defendant told a nurse, and she sent him home to get an unopened can of formula as well as to return the damaged pants to the hospital. Defendant's leg was not injured or burned.

Defendant testified that he went to Sheila's house after changing his pants and took an unopened can of formula from a closet. He went to work at a disco from 9 p.m. to 2 a.m. although he denied going to work in his 1988 deposition. Defendant had been told that Quinten was stable but he was aware that the hospital might not be able to help Quinten. Defendant gave the unopened can and pants to Nurse Etzler in the early morning hours of June 1, 1984.

Defendant denied giving acid to Sheila or anyone in her household. He denied tampering with the formula or bottles and said he did not administer the acid to Quinten. Defendant never suspected Sheila until she pleaded guilty. He explained that when he gave his 1988 deposition he did not have much notice and had refreshed his memory since then. He denied speaking to Lageotakes.

Defendant explained that he was contacted in August 1987 by the attorneys to sign some papers in the formula lawsuit. He had gone

with Sheila only once to the attorneys' office, but had met with the attorneys often in the DCFS action. He signed other papers in the formula lawsuit. He was never told to admit paternity in order to be named in the formula lawsuit. In his 1988 deposition, defendant said he first discussed a lawsuit with Sheila one week after the incident.

Defendant received a settlement of about $7,000 from an unrelated lawsuit in June 1984. During its case in chief, the State had shown that the settlement agreement was dated June 5, 1984, and the check was dated June 20, 1984. The State also showed defendant bought a new Chevy Camaro on June 15, 1984, and applied for credit on June 5, 1984. Defendant put down $4,000 on the car with monthly payments of $300. He saved $2,000 to pay bills although he could not recall what bills. He paid nothing for Quinten's hospital or funeral expenses. Defendant denied needing money at the time of the incident and expected to return to work. However, he did not have $300 to repair his car; had no money for snacks on May 30, 1984; went to work at the disco on May 31, 1984, because he needed money; and he could not afford to live in an apartment when he was laid off from American Motors in January 1984.

Dr. Robert Eberhardt, a forensic toxicologist, and Dr. Russell Nelson, a chemist specializing in cellulose chemistry, testified for the defense. Since the physical evidence was not available, they relied on the test results from the State's experts and various other material such as police reports, trial testimony, etc. They also conducted experiments. Eberhardt indicated that Dr. Lewis must have misspoken during his testimony regarding his recollection that the acid was at "3 molar" and then calculated 20% by volume. Eberhardt said the calculations were reviewed with the prosecution and that Lewis meant the acid was "3 normal" or about 10% by volume and that everyone who had conducted an analysis of the open can of formula was in that range.

Eberhardt and Nelson agreed with earlier testimony that Quinten's injuries must have been caused by a concentration of acid stronger than 8% by volume. Studies indicated that up to 10% concentration of sulfuric acid would have a negligible effect on human skin. Eberhardt indicated that a separation would occur when acid was added to the formula and a curd and a liquid would result. He also said corrosion would begin right away even at 2.9 normal. Nelson testified that the protein portion of the formula would be "denatured" upon addition of the acid and curdling was possible.

The witnesses criticized Pirl's methodology and his conclusions with respect to Pirl's tests for iron and the effects of acid on defend-

ant's pants. Regarding the spill on the car seat, they explained that acid would penetrate to the foam of the car seat and be forced to the surface through compression, *i.e.*, sitting on the seat. The acid would not damage the seat fabric in the same way as the cotton pants because the seat fabric was synthetic.

Eberhardt and Nelson expressly disagreed with Pirl's conclusion that the damage to the pants could not have come from the can of formula. They noted that photographs of the pants did not show a "charring" as Pirl indicated. After describing various problems with Pirl's methods and based on their own experiments, the experts concluded that defendant's pants could have been damaged as a result of the spill in the car. The experts noted that studies showed there would be no burning or injury to defendant's skin by contact with a solution up to 10% volume of sulfuric acid.

After defendant rested, the State offered rebuttal which has already been incorporated into these facts. A stipulation was entered which showed several inconsistencies between defendant's trial testimony and his 1988 deposition in the formula lawsuit.

In finding defendant guilty beyond a reasonable doubt, the trial court noted that it did not know when and how the acid got into the (Sheila) Smith household, what happened to the other bottles or why the State did not call Sheila. The court would not draw a negative inference against the State for not calling Sheila as a witness. It believed the hospital personnel regarding defendant's reaction to sue and believed that defendant did speak to Lageotakes. However, it found defendant not credible based on his demeanor and inconsistent statements. It also found Pirl's testing unconvincing, referring to Pirl's tests for iron and the tests for the effects of acid on defendant's pants. The court indicated this was not essential because the tainted can did not cause the injuries.

Defendant's post-trial motion was denied. Defendant was subsequently sentenced to an extended term of 80 years in prison.

We initially address defendant's second issue. Defendant asserts that he was denied due process of law where the State negligently lost the open can of formula and the baby bottle. The court denied defendant's pretrial motions to either dismiss the charge or exclude any evidence concerning the State's chemical testing of the evidence. Defendant argues that the standard in *California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528, controls the issue rather than *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333.

The Supreme Court's most recent decision in the constitutionally guaranteed access to evidence area of law is *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333. (*People v. Holmes* (1990), 135 Ill. 2d 198.) The *Youngblood* court utilized a "bad faith" standard in assessing the due process implications of the State's failure to preserve potentially useful evidence. (*Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337; *Holmes*, 135 Ill. 2d at 209.) Under this standard, the failure to preserve potentially useful evidence does not constitute a denial of due process unless a defendant can show bad faith on the part of police. (*Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337; *Holmes*, 135 Ill. 2d at 209; *People v. Young* (1991), 220 Ill. App. 3d 488, 496.) The Court in *Youngblood* noted that unlike *California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528, the State in *Youngblood* did not attempt to make any use of the materials in its own case in chief. (*Youngblood*, 488 U.S. at 56, 102 L. Ed. 2d at 288, 109 S. Ct. at 336.) This fact was due to the State's failure to perform any tests on the semen stains found on the victim's clothing or properly to preserve the clothing. Expert testimony at trial indicated that testing may have provided results which could have exonerated the defendant. Defendant argues that *Youngblood* does not apply because the State relied on the evidence in its case in chief against defendant.

Illinois cases that cite *Youngblood* have not indicated that the bad-faith standard only applies when the evidence is used in the State's case in chief. (*E.g., Holmes*, 135 Ill. 2d 198; *People v. Hall* (1992), 235 Ill. App. 3d 418; *Young*, 220 Ill. App. 3d 488; *People v. Brooks* (1991), 214 Ill. App. 3d 531; *People v. Stallings* (1991), 211 Ill. App. 3d 1032; *People v. Lampkin* (1990), 193 Ill. App. 3d 570.) We recognize that not all these cases cited involved the use of evidence in the State's case in chief or turned on another basis. However, in *Lampkin*, the State presented evidence concerning the blood types of certain blood samples found at the scene of a triple murder. The blood samples were not properly preserved so that no further testing by defense experts or the State was possible. After noting *Trombetta* and *Youngblood*, the court found that there was no showing of bad faith on the State's part in the handling of the samples. The defense was free to point out to the jury that it could not independently test the blood samples, and the jury could consider this fact in determining the weight to be given to the samples. If the *Youngblood* standard of bad faith were applied in the case at bar, no due process violation occurred by the State's use of test results showing the presence and amount of sulfuric acid in the baby bottle or can of formula because

the loss of the physical evidence was not due to bad faith on the part of the State.

■ We look first at the open can of formula. The State points out that the trial court did not find Dr. Pirl credible and did not rely on his findings in determining guilt. It contends that this result is similar to the State not presenting the evidence in its case in chief and, therefore, the *Youngblood* standard of bad faith controls. Defendant correctly replies by noting that two other State experts testified about the amount of acid in the can: Dr. Lewis and Darryl Sullivan. We have examined the trial court's remarks, and the court found that Pirl's testing was unconvincing. It specifically referred to Pirl's tests for iron and his tests with the acid on defendant's pants in explaining why the tests were unconvincing. However, the court also indicated that the can of formula did not cause the injuries. While we agree with the State that there was other evidence to support this finding besides the evidence of the amount of acid in the can, the trial court may have relied on Pirl's findings and the other State experts to make this particular determination. Therefore, we must decide whether defendant was denied due process by the use of this evidence under *California v. Trombetta.*

Under *Trombetta,* a due process violation occurs if the evidence possessed an exculpatory value that was apparent before the destruction of the evidence *and* was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. (*Trombetta,* 467 U.S. at 489, 81 L. Ed. 2d at 422, 104 S. Ct. at 2534; *People v. Kidd* (1989), 180 Ill. App. 3d 1065, 1073.) Only when both of these factors are present will a due process violation be found. *Kidd,* 180 Ill. App. 3d at 1073.

In discussing *Youngblood,* defendant conceded that there was no evidence to suggest the State knew that the physical evidence had any exculpatory value when it was lost. (See *Kidd,* 180 Ill. App. 3d at 1074.) The absence of an apparent exculpatory value of the evidence at that time precludes a finding of a due process violation under *Trombetta.* (*Kidd,* 180 Ill. App. 3d at 1073.) Despite any concession by defendant, after a dispassionate review of the tests used to determine the presence and amount of acid in the can, we conclude that the chances are extremely low that preserved physical evidence would have been exculpatory. See *Trombetta,* 467 U.S. at 489, 81 L. Ed. 2d at 422, 104 S. Ct. at 2534.

We find it significant that besides Dr. Pirl's two tests, a pH test done with indicator paper and a barium chloride test, two other experts tested the formula resulting in similar findings. Dr. Lewis used

pH paper to find the presence of acid, and Darryl Sullivan from an independent laboratory in Wisconsin used an ion chromatograph to test for acid. Defendant's own expert, Dr. Eberhardt, testified that he reviewed the calculations with the prosecution and found that "everyone who has done any analysis is in agreement that we're in that ball park" of about 3 normal sulfate concentration. This number reflected about 10% by volume of sulfuric acid in the can of formula. Although defendant distinguishes *Trombetta* from this case on the basis of the officially certified and widely accepted Intoxilyzer or breathalyzer device used in *Trombetta*, we find that the different tests performed by different individuals resulting in very similar findings in this case lead to the conclusion that the chances are extremely low that preserved physical evidence would have been exculpatory.

Even if one were to assume that all the tests were inaccurate and that the formula might have been exculpatory, it does not follow defendant was without alternative means of demonstrating his innocence. (*Trombetta*, 467 U.S. at 490, 81 L. Ed. 2d at 423, 104 S. Ct. at 2534-35.) The inability of defendant to test the formula does not mean he has met the second requirement for a due process violation to exist as he suggests. If this were the case, the second requirement would always be met by the fact the evidence was lost or destroyed.

At issue here is the acid in the can of formula. Defendant had the opportunity to raise issues concerning the accuracy of the tests used to determine the amount of sulfuric acid and to impeach the data from the acid tests without resort to the preserved formula. (See *Trombetta*, 467 U.S. at 490, 81 L. Ed. 2d at 423, 104 S. Ct. at 2534-35; see generally *Kidd*, 180 Ill. App. 3d at 1073-74.) Defendant cross-examined the State's experts about their tests. He presented two experts, and neither expert criticized or impeached the tests used by the State's experts to determine the presence and amount of acid in the can of formula. While defendant's experts severely criticized and impeached Pirl's test procedures with respect to the presence of iron in the formula and the effects of the acid on defendant's pants, testimony which resulted in the trial court finding Pirl's testing in those areas unconvincing, they did not criticize or impeach Pirl's methods of testing for the substance and amount of acid in the can. In fact Eberhardt stated that one of the tests used by Pirl was a "very common test that most analysts would use." The methods used by Lewis or Sullivan were not shown to be defective. The only criticism of Lewis was that during his testimony his recollection of the amount of acid as shown by the tests was incorrect. Thus, defendant was able to obtain comparable evidence by other reasonably available means, and

no due process violation occurred by the use of the test results showing the amount of sulfuric acid in the can.

As to the baby bottle, defendant contends that further testing may have shown a higher level of sulfuric acid than 2.5% by volume, which would indicate that the bottle may have caused the injuries. Defendant was not shown to be responsible for the acid in the bottle. He claims the court would have had to evaluate the evidence in a new light, but does not actually suggest the bottle might have provided exculpatory evidence.

The only person to test the baby bottle contents for acid was Pirl. He used the same tests on the contents of the bottle as he did on the formula. If the tests were inaccurate, defendant had alternative means of demonstrating his innocence in the same manner that he had for the can of formula. Defendant could and did cross-examine Pirl on his methods as well as present defendant's own experts, and defendant's experts did not impeach the test results of the baby bottle. No due process violation occurred under *Trombetta*.

Furthermore, if the bottle did contain enough acid to cause the injuries, the manner in which Sheila administered the acid may have been established. This fact would have no exculpating effect on defendant regardless of the fact that he was not connected to the acid in the bottle, because he was convicted based on accountability. Irrespective of what the bottle contained, there exists the evidence of defendant's tampering with the open can of formula which went towards his guilt.

Next, defendant contends he was not proved guilty beyond a reasonable doubt of murder based on accountability. Defendant attacks several aspects of the State's case against him. Prior to addressing these points, we note that defendant has provided only four citations to authority in his initial brief, two of which concern the standard of review. The State's brief is as inadequate as defendant's in this respect, citing only three cases. While we realize that a case similar on its facts may not be available, there is case law which generally addresses some of the points of law being argued by the parties.

When an appeals court reviews the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89; *People v. Williams* (1991), 209 Ill. App. 3d 709, 724.) It is not this court's function to re-

try the defendant. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191.) The determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence is the responsibility of the fact finder. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226.) A reviewing court may not substitute its judgment for that of the trier of fact on questions concerning the weight of the evidence or the credibility of the witnesses but will reverse only if the evidence is so improbable, impossible or unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Winfield* (1983), 113 Ill. App. 3d 818.) A conviction based upon testimony that is improbable, unconvincing and contrary to human experience requires a reversal. *People v. Ware* (1988), 180 Ill. App. 3d 921, 929.

■ Defendant points to the trial court's finding, wherein it stated that defendant aided Sheila "prior to and after" the incident. He argues that under a theory of accountability a person is liable where he aids or abets another before or during an offense, not afterward. One who aids another in the planning or commission of an offense is legally accountable for the conduct of the person he aids. (*People v. Dotson* (1986), 143 Ill. App. 3d 135.) While it is true that legal accountability is based on a defendant's assistance before or during the commission of the crime, a defendant's conduct subsequent to the offense may raise an inference of prior or concurrent participation. (*People v. Bell* (1991), 209 Ill. App. 3d 438; *People v. Grice* (1980), 87 Ill. App. 3d 718.) Furthermore, accountability can be established through a person's knowledge and participation in a criminal scheme even though there is no evidence of his direct participation in the criminal act. *Dotson*, 143 Ill. App. 3d at 142.

Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged; however, it is not necessary that each link in the chain of circumstances be proved beyond a reasonable doubt. (*People v. Gomez* (1991), 215 Ill. App. 3d 208.) It is sufficient if all the evidence taken together satisfies the fact finder beyond a reasonable doubt. (See *People v. Jones* (1985), 105 Ill. 2d 342.) While much of the evidence against defendant herein was circumstantial, Lageotakes testified that defendant admitted to him that defendant planned and aided in the offense. This admission constitutes direct evidence. *People v. Panus* (1979), 76 Ill. 2d 263; *People v. Vella* (1985), 133 Ill. App. 3d 104.

Defendant asserts that Lageotakes' testimony is unworthy of rational belief and is not corroborated by the other evidence. While Lageotakes' credibility was impeached by proof of conviction of prior crimes (*People v. Montgomery* (1971), 47 Ill. 2d 510), the weight to be

given to the testimony is for the trier of fact even where the witness was thoroughly impeached. (See *People v. Mack* (1982), 107 Ill. App. 3d 164; *People v. Sauder* (1973), 10 Ill. App. 3d 482.) The fact that Lageotakes had prior felony convictions does not render his testimony unworthy of belief.

It has been held that when it appears a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth. (*People v. Williams* (1976), 65 Ill. 2d 258 (wherein the defendant was promised a release from prison).) Strong incentive to manufacture testimony in order to obtain rewards from the State is a matter for the trier of fact to weigh with the other evidence. (See *Mack*, 107 Ill. App. 3d at 170.) However, the record herein is void of any evidence that Lageotakes was to receive any kind of special favor from the State. Lageotakes admitted that he approached the State in hopes of making a deal, but no deal was promised. Defendant could inquire into promises or expectations of special favor whether based on fact or imaginary to show Lageotakes' bias, interest or motive. (*People v. Triplett* (1985), 108 Ill. 2d 463.) Although Lageotakes stated that he still wanted to be transferred to another prison, his unjustified hope does not render his testimony improbable or suspicious. See *People v. Howard* (1991), 209 Ill. App. 3d 159.

■ While Lageotakes heard defendant make the admission in August 1989, he did not come forward for several months. This time lapse went to credibility and the weight of the evidence to be determined by the trier of fact. (*Howard*, 209 Ill. App. 3d at 175; *People v. Baggett* (1983), 115 Ill. App. 3d 924.) The fact finder was aware of the circumstances under which Lageotakes talked to the State's Attorney, and these circumstances impacted on his credibility, which was reserved for the trial court to determine. (See *Howard*, 209 Ill. App. 3d at 176.) Defendant points out that Lageotakes "painted himself into a corner" because he left himself open to compulsory process or possible prosecution for obstructing justice or perjury if he changed his account. We note that these points generally apply to most witnesses. Once again, this matter went to Lageotakes' credibility and the weight to be accorded his testimony, determinations for the trial court. Defendant improperly states that Lageotakes had to continue to cooperate if he wished to obtain his reward. There was no reward promised to Lageotakes.

Defendant also compares Lageotakes' credibility to Melock's claiming that Melock's bias "paled" compared to Lageotakes'. It is the duty of the trial court to determine the credibility of the wit-

nesses and the weight to be given their testimony. (*People v. Snulligan* (1990), 204 Ill. App. 3d 110.) Here the trial court concluded that Lageotakes was the more credible witness. (See *Snulligan*, 204 Ill. App. 3d at 119.) We observe that defendant's assertion of Lageotakes' bias is based largely on conjecture as there was no arrangement for Lageotakes' testimony. However, Melock admitted that he was biased against the State, perhaps the instant prosecutor, and it was adverse to his interests to admit the conversation took place.

Defendant contends that Lageotakes' testimony was not significantly corroborated, was insufficient in detail, and could have been concocted from press articles. Lageotakes said defendant wanted money to go into business with an unnamed friend. The State produced evidence that defendant, while not destitute, needed money although there was no evidence of any business deal being contemplated by defendant.

Defendant told Lageotakes that he paid someone to lose the physical evidence. The evidence indicated that the physical evidence was inadvertently or negligently lost or destroyed by the Department of Public Health. However, this statement by defendant can be viewed as nothing more than "puffery" among fellow inmates.

Defendant said he obtained the "rare" acid from an unnamed friend from an unnamed lab. Defendant claims there was no evidence that defendant had any friends with access to acid. However, this statement is consistent with defendant's belief that only laboratories had access to sulfuric acid.

Lageotakes' testimony was corroborated as to certain details. Defendant went to his girlfriend's house before going fishing. Lageotakes' testimony showed defendant's girlfriend had a sister. Defendant went to his family's house after fishing and was present there when defendant heard about Quinten. Defendant bought a Chevy Camaro. There was also circumstantial evidence which corroborated Lageotakes' testimony regarding defendant's motive.

Lageotakes said defendant switched the can of formula or bottle for a tainted one before defendant went fishing on May 30, 1984. Defendant puts forth several hypothetical questions based on that testimony in comparison with the findings of fact. These questions do not take the place of proper legal argument. In any event, we find defendant's questions unnecessary to reconcile with the other evidence because the trial court did not accept this part of Lageotakes' testimony as evidence of fact. The trial court specifically determined that left unanswered was when and how the acid got into Sheila's household. As the trier of fact, the court could accept or reject as

much of the witness' testimony as it pleased, and a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the credibility of witnesses. (*Snulligan*, 204 Ill. App. 3d at 118.) The trial court's finding that defendant made the statements to Lageotakes went to the weight and credibility of the witnesses, and its determination should not be disturbed unless manifestly erroneous. (*Ware*, 180 Ill. App. 3d at 929.) We do not find the trial court's determination of Lageotakes' credibility manifestly erroneous.

█ The court drew an inference from the testimony that defendant tainted or switched the open can of formula before he brought it to St. Therese. Reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. (*Steidl*, 142 Ill. 2d at 226.) Both Willie Bea and defendant testified that the formula looked and smelled normal at the house. Willie Bea also said the can was clean. Expert testimony showed that the physical composition of the formula would be affected upon introduction of the acid and that curdling or coagulation would occur. Also, corrosion of the can would begin immediately. Other testimony showed that when defendant brought the can into St. Therese, it smelled tainted, and the can looked corroded, dirty, "grungy." Examination of the formula at the hospital showed a distinct separation of a watery substance on the top and a coagulated, curdled liquid on the bottom. Based on this evidence, a reasonable inference could be drawn that defendant tainted the can of formula while it was in his control between the time it left Sheila's house and arrived at the hospital.

Defendant questions Willie Bea's and his own powers of observation. He contends that none of the nurses were able to observe the coagulation of the can, and Dr. Lewis only saw it by removing the contents with a pipette. Defendant claims that Willie Bea and defendant were lay persons acting under stress and could have missed the coagulation.

Defendant's point goes to the credibility of the witnesses which was for the trier of fact to determine. The court was fully aware of the conditions under which Willie Bea observed the formula and found her testimony credible. We note that none of the nurses or Dr. Lewis poured the liquid from the can as Willie Bea did. Also, Willie Bea did not observe any corrosion to the can, and she detected no smell.

In his brief and specifically in oral argument, defendant argued that the trial court failed to consider Willie Bea Smith's motive to lie about the formula. He claimed that her motives to lie were to disassociate herself with the tainted can and to protect her sister Sheila.

However, the suggestion that Willie Bea lied about the formula's appearance would also indicate that defendant lied about it as well. Furthermore, defendant does not point to any evidence, nor does the record provide evidence, that Willie Bea was involved in the offense and, thus, would have a motive to distance herself from the tainted can. During the trial Alvin Ray Smith testified that Sheila already pleaded guilty to the offense. Thus, Willie Bea had no reason to protect her sister.

Defendant claims that the evidence did not establish a specific time period in which the formula would coagulate upon addition of the acid nor did it establish whether the effects were progressive. Based on this argument, he posits that Willie Bea added the acid to protect her sister and the formula coagulated en route to the hospital. First, although the experts did not specify a time period in terms of increments, their testimony was sufficient to establish that the formula, as well as the can itself, would be affected upon introduction of the acid. The experts indicated that corrosion would begin immediately and would progress causing the iron content to increase.

There was no evidence of a criminal motive to taint the can on Willie Bea's part. Tainting the can would not necessarily have protected Sheila, but in all likelihood would have incriminated her. Also, defendant fails to consider that Willie Bea was not aware of what specifically was wrong with Quinten at that time. Evidence indicated she was told Quinten was sick and vomiting, and defendant told her he had to get the formula. However, there is no evidence to indicate how or why Willie Bea would have known to add sulfuric acid to the can in order to be consistent with Quinten's injuries in an attempt to incriminate defendant.

Defendant argued that he could have said the formula looked "bad" when Willie Bea poured it out so he could shift suspicion to someone in the household. The State pointed out that defendant was not interested in blaming someone else, but rather wanted to shift liability to the manufacturer. Also, there was no indication that defendant would know the effects of acid mixed with formula in order to lie about the appearance.

Defendant claimed during oral argument that he had an earlier opportunity to taint the can but did not. Defendant said he went to the Smith house after Sheila called him but everyone had left for the hospital. However, defendant testified that when he got to Sheila's, Alvin Ray was there. Alvin Ray told defendant that everyone else had gone to the hospital. Thus, defendant did not have this earlier opportunity to taint the can. We tend to agree with defendant's observation

that he could not have been certain that he would be sent to the house to retrieve the items. However, the evidence established that given the opportunity, defendant took steps in furtherance of his plan to injure Quinten and sue the formula manufacturer.

Defendant contends that the trial court ignored defendant's testimony that the formula spilled in the car which could account for the depletion of liquid in the can. The trial court may have believed that the liquid in the can was lower by the time it arrived at the hospital because defendant tampered with it in the car, and the can spilled. The court's remarks merely indicate that it may not have believed defendant's version of how the spill occurred.

In reply to the State, defendant asserts that the conclusion of tampering depends entirely upon Pirl's findings as to the amount of acid in the can which even defense experts agreed was too weak to cause Quinten's injuries. He notes that he was unable to test the formula. We have already discussed the witnesses' observations which provided sufficient evidence that defendant tampered with the can. Under the first issue, we concluded that no due process violation occurred by the use of test results from the lost physical evidence.

Furthermore, the trial court's finding is supported by evidence presented by defendant's experts which neither the State nor defendant has noted. Defendant's experts explained that defendant did not suffer any injury to his skin from the acid on his pants because a concentration of up to 10% sulfuric acid would not cause injury to his skin but could damage his pants. Thus, if the acid in the can were higher, defendant would have been injured when he sat in the area where he claimed the formula spilled. Since he was not, the can must have contained no more than 10% by volume of sulfuric acid, further supporting the court's conclusion that the tainted can could not have caused Quinten's injuries.

We also find corroboration that defendant tainted the can by defendant's actions with the police. Officer Williams spoke to defendant at Sheila's house, and defendant told him that defendant searched the house for chemical substances that Ricky, Jr., could have gotten into, but defendant found nothing. Defendant failed to bring to the officer's attention the bottle, formula, vinegar or cough medicine. Defendant argues in his reply brief that there was no evidence that defendant deliberately concealed the can of formula and that he did not interfere with the search. During oral argument, defendant noted that the hospital told defendant to bring the items back. Despite defendant's attempts to color this interchange as meaningless, a rea-

sonable inference can be drawn that defendant deliberately withheld the evidence from the police.

Several witnesses testified about defendant's preoccupation with the formula as the cause of Quinten's injury and defendant's desire to sue Abbott Labs. Defendant claims that this reaction was sensible in view of defendant's discovery of the damage to his pants. The evidence showed, however, that defendant tampered with the can of formula between the time it left Sheila's and it arrived at St. Therese. Other testimony showed defendant spoke of the formula as the cause and suing the manufacturer before he noticed any damage to his pants or had any specific information about Quinten's injuries. In view of this evidence, defendant's remarks after "discovering" the damage to his pants do not give rise to reasonable interpretations of innocence (see *People v. Dowaliby* (1991), 221 Ill. App. 3d 788), as defendant suggests, but the remarks corroborate other evidence linking defendant to the murder. (*Dowaliby*, 221 Ill. App. 3d at 800.) Also, unlike *Dowaliby*, *Gomez* (215 Ill. App. 3d 208) and *People v. Lovelace* (1991), 221 Ill. App. 3d 20, cited in defendant's reply brief, there was direct evidence of defendant's admission of his involvement in the murder in this case.

Mariann Carlton testified that defendant was blaming the formula and saying he was suing Abbott Labs upon his arrival at St. Therese's emergency room. Defendant posits that Carlton is not believable because a State Police officer testified that she did not tell him that information in her statement on June 15, 1984.

It is true that when a witness is given an earlier opportunity and fails to assert a fact, the credibility of his later testimony as to the existence of such fact is adversely affected. (*People v. Kennard* (1990), 204 Ill. App. 3d 641.) However, Carlton testified that she did relate defendant's remarks to the police during her statement. Matters of conflict in the testimony as well as questions of the credibility of the witnesses are for the trier of fact. (*People v. Fabian* (1976), 42 Ill. App. 3d 934.) The trial court found Carlton's testimony credible, and its finding will not be set aside unless it is so unsatisfactory as to justify a reasonable doubt of defendant's guilt (*People v. Evans* (1984), 122 Ill. App. 3d 733), which we do not conclude. Defendant also told Willie Bea when he left St. Therese that he was going home to get the formula.

Defendant notes that defendant's knowledge that Abbott Labs made the formula was not surprising since his sister worked there. However, this knowledge is also corroborative of defendant's guilt to a small extent. Defendant knew Abbott made the formula, and

defendant also believed that only a laboratory like Abbott would have access to sulfuric acid. Defendant spoke of the manufacturer before he saw the type of formula in Sheila's refrigerator. He spoke of the formula before he knew whether Quinten even had any formula. This evidence corroborates defendant's motive and shows guilty knowledge.

Defendant takes issue with the court's finding that defendant was remote and disinterested at the hospital. Reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. (*People v. Steidl* (1991), 142 Ill. 2d 204.) The trial court acknowledged that people act differently under stress. However, defendant went to work from 9 p.m. to 2 a.m. on the night of Quinten's injury although he was aware that the hospital may not have been able to help Quinten. Furthermore, defendant delayed many hours in returning the unopened can of formula and his pants to the hospital while he went to work despite the hospital's request for these items. There was other evidence of defendant's lack of interest to support the court's finding. Defendant's behavior corroborates his motive.

Defendant contends that the evidence concerning defendant's need for money as a motive for his plan was uncompelling and that he was not destitute. In its findings the trial court mentioned that defendant was unemployed but bought a car a few days after the incident. The court found this and other actions by defendant "unnatural." Thus, we are not as certain as defendant that the court inferred from these facts that defendant expected a financial windfall. It was reasonable, however, to infer that buying a car when defendant was unemployed and while Quinten was severely injured was unnatural. Defendant admitted he used none of his settlement money to pay for Quinten's medical expenses.

Generally, any evidence which tends to show the accused had a motive for killing the deceased is relevant and admissible so long as the evidence, to a slight degree, establishes the existence of the motive relied upon. (*People v. Wooten* (1990), 198 Ill. App. 3d 591.) Lageotakes' testimony provided direct evidence of defendant's motive for poisoning Quinten with acid: to sue Abbott Labs. In support of this motive, the State introduced evidence of defendant's poor financial condition and his need for money. Defendant was unemployed, and while he expected and did return to work, he did not actually return until after the incident. He could not afford an apartment and had to move in with his parents a few months before the incident where he still remained. He had no money to buy food when he went fishing. Defendant went to work the night his son was injured be-

cause he needed money. He had not settled his lawsuit when the incident happened, and his job was unstable due to layoffs. There was sufficient evidence to support an inference that defendant needed money.

Defendant takes issue with the court's finding that it was unnatural that defendant conferred with Sheila within a day of Quinten's injury to hire an attorney, especially since the idea originated with a Children's Memorial staff person. However, there was evidence that defendant broached the subject of a lawsuit immediately upon his arrival at St. Therese. Although defendant claims it was natural for a father to take immediate steps to preserve Quinten's legal rights, we find this argument difficult to reconcile with defendant's lack of concern for Quinten's physical well-being. Defendant was told the hospital needed the unopened can of formula and his pants in order to assist the hospital in finding the cause of Quinten's injuries. Yet, defendant took several hours to bring these items to the hospital.

Defendant also argues that the court never explained why defendant's decision to sue Abbott Labs or his involvement in a prior unrelated lawsuit served to prove his accountability for murder. First, these were only factors in the chain of circumstantial evidence, as well as corroboration of direct evidence, that defendant planned to poison Quinten with acid in order to sue Abbott Labs. Furthermore, defendant's contention that these circumstances "beg the question" because they appear sinister, only if motive is assumed, ignores the direct evidence of defendant's admission of his plan.

The court's mention of these facts merely indicates that defendant was knowledgeable concerning the benefits of civil litigation. Defendant did not seek to establish paternity at anytime that Quinten was alive but sick. A reasonable inference could be drawn that defendant sought paternity only to file suit. The filing of the lawsuit corroborates defendant's prior plan to injure Quinten in order to sue.

Defendant takes issue with the court's conclusion that defendant was not truthful. He concedes that the court's judgment based on defendant's demeanor cannot be reviewed by this court. However, the court also found defendant untruthful because of "inconsistent statements." He claims that while defendant made several inconsistent statements in his 1988 deposition, they went to collateral issues.

■ A conviction must rest on the strength of the State's case, not the weakness of defendant's case. (*Lovelace*, 221 Ill. App. 3d at 24.) However, when a defendant elects to explain the circumstances of what occurred, he is bound to tell a reasonable story or be judged by its improbabilities. (*People v. Williams* (1991), 209 Ill. App. 709.) A

witness is not discredited by a slight variance between his testimony and prior statements, absent a material inconsistency or contradiction. (*People v. Thomas* (1979), 72 Ill. App. 3d 186.) While none of defendant's prior inconsistent statements standing alone would be a material contradiction to find defendant untruthful, the number of inconsistent statements supports the court's finding. Besides inconsistent statements in his deposition, defendant also made inconsistent statements to Witkowski. A finding of guilt indicates that the court believed the State's case against defendant and did not believe defendant. In view of the evidence against defendant, the court could judge defendant's credibility based on the improbabilities of his story. See *Williams*, 209 Ill. App. 3d at 721.

■ Defendant claims that a key question is left unanswered: what specifically caused the injuries to Quinten? He acknowledges that while they were caused by acid, there was no finding as to where the acid came from, where it went and how it was administered. However, these questions do not have to be answered in order to prove defendant guilty based on accountability beyond a reasonable doubt. The evidence proved that defendant plotted with Sheila before the incident to administer acid to Quinten in order to sue for civil damages from the maker of the formula. The evidence established that Sheila administered the acid in the morning of May 31, 1984. Defendant did not have to participate physically in the overt act to be legally accountable. (*Dotson*, 143 Ill. App. 3d at 142.) His subsequent actions gave rise to an inference of his prior participation (*Grice*, 87 Ill. App. 3d at 725) and corroborated the existence of the plan and his motive. The State did not have to prove the manner in which the acid was administered. While defendant suggests that the lost baby bottle could have been used, this fact would not change the evidence of defendant's guilt: his admission, his tampering with the can of formula, and the various reasonable inferences of guilt drawn from his behavior and statements.

While defendant throws out rhetorical questions which he points out the State did not answer, we again admonish defendant that these are not proper legal argument. In any event, defendant wonders why the police found no evidence that Quinten vomited or that Sheila was making a bottle when Sheila reported these matters. These issues obviously went to the credibility of Sheila's story.

Defendant questions why no other baby bottles were found despite evidence that there were several in the household. After this court thoroughly examined the testimony regarding the baby bottles, we note only Tinnie Smith said there were several bottles around the

house; however, she clarified that these bottles were kept in a kitchen cabinet. The fact that the police officers did not find any bottles "around" the house does not cast a reasonable doubt on defendant's guilt.

Lastly, defendant wonders about the fact that no cleaning materials were found in Sheila's house within hours of the incident although several people lived there. Defendant refers to the officers' search as "thorough"; however, their own testimony shows they only searched places they believed a three-year-old could access. They did not go in the basement. The fact they found no cleaning supplies does not raise a reasonable doubt of defendant's guilt.

The evidence supported to a reasonable and moral certainty that defendant committed the offense of murder based on accountability. (*Gomez*, 215 Ill. App. 3d at 216.) Defendant was proved guilty beyond a reasonable doubt.

Next, defendant contends the court erred in refusing to draw a negative inference against the State from the State's unexplained failure to call Sheila Smith as a witness. He claims the court refused to consider that she entered into a plea agreement in which she agreed to testify for the State because the plea agreement was not evidence in the case. We disagree. The court stated: "there is no evidence as to a plea agreement in this case. Assuming there were and the plea agreement included truthful testimony, I could infer that it would be harmful to the State's case, but I won't." The remarks indicate that even with evidence of the plea agreement, the court would not draw a negative inference against the State. However, the question remains whether the court properly refused to draw the inference.

The State is not obligated to call every witness who might testify concerning evidence of the crime. (*People v. Farnsley* (1973), 53 Ill. 2d 537; *People v. Banks* (1981), 98 Ill. App. 3d 556.) The failure to do so does not ordinarily create a presumption that the testimony of that witness would be unfavorable to the State. (*People v. Zenner* (1980), 84 Ill. App. 3d 566.) As a general rule, if a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative, and the witness' relationship with the State is such that it would ordinarily be expected to favor it, the State's failure to call the witness *may* give rise to a permissible inference that, if the witness were called, the witness' testimony would have been unfavorable to the State's case. (*People v. Jimerson* (1979), 69 Ill. App. 3d 403.) The accused has the right to comment on the unexplained absence of a witness, but the State may accept the risk of negative inferences from the unexplained ab-

sence of a witness so long as the offense is otherwise proved. (*People v. Scott* (1967), 38 Ill. 2d 302.) However, no negative inference is raised when the witness is also known and available to the defense yet is not called by it. *Farnsley*, 53 Ill. 2d 537; *People v. Nowak* (1970), 45 Ill. 2d 158; *People v. Laughlin* (1987), 163 Ill. App. 3d 115; *People v. Thompson* (1981), 93 Ill. App. 3d 117; *Zenner*, 84 Ill. App. 3d 566.

In the instant case, defendant has failed to assert that Sheila Smith was not available to the defense, and thus no negative inference is raised. (*Laughlin*, 163 Ill. App. 3d at 124.) She was known and available to defendant, and he cannot claim prejudice by the State's failure to call her. (*People v. Boclaire* (1981), 95 Ill. App. 3d 536.) Defendant relies on *Wilkey v. Illinois Racing Board* (1978), 65 Ill. App. 3d 534, in arguing that he had no burden of proof under which he had an obligation to call Sheila. *Wilkey* involved the failure of the racing board to test samples which would have decisively established the absence of an illegal drug. The board had offered the defendant the opportunity to test the samples which the court found to be an attempt to persuade the defendant to prove his innocence. However, the issue herein involves a negative inference arising from the failure to call a witness. The burden of proof is not being shifted to defendant by his failure to call Sheila as no negative inference arises against defendant; it merely makes the negative inference against the State inoperative. While defendant also cites *People v. Plum* (1976), 44 Ill. App. 3d 922, we find that case inapposite. The *Plum* court failed to instruct the jury regarding negative inferences which could be drawn against the State for failing to call a witness. Here, there was no jury, and the trial court was fully aware of the inference; it just refused to draw it. Even if we were to assume that the State's failure to call Smith as a witness gave rise to a negative inference, this fact does not warrant reversal of defendant's conviction. The State presented sufficient evidence of defendant's guilt beyond a reasonable doubt, and a negative inference would not change the result. See *Jimerson*, 69 Ill. App. 3d at 412.

Defendant points out that the State made no attempt to vacate Sheila's plea agreement for failing to testify. Taking defendant's position that the circumstances of the guilty plea could be considered by the court in drawing the inference, *arguendo*, we note the plea arrangement provided that Sheila would testify against defendant. The fact that the State did not move to vacate Sheila's guilty plea agreement leads to an inference that she was apparently in compliance with the agreement but the State chose not to call her.

Lastly, defendant contends that the maximum extended term of 80 years' imprisonment was excessive in view of the factors in mitigation and his potential for rehabilitation. While defendant acknowledges that an extended term is appropriate and that the trial court did consider mitigating factors, he claims the court undervalued these factors.

The Illinois Supreme Court has recently discussed the standard of review for sentencing cases in *People v. Streit* (1991), 142 Ill. 2d 13, 18-19. The standard of review is whether a trial court has abused its discretion in imposing a sentence. A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently. *Streit*, 142 Ill. 2d at 18-19.

■ The trial court found that defendant was eligible for the death penalty or natural-life imprisonment. However, in view of certain mitigating factors, the court determined these sentences would not be proper. (See *People v. Clemons* (1989), 179 Ill. App. 3d 667.) It did find that defendant qualified for an extended term of imprisonment because the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2; *Clemons*, 179 Ill. App. 3d at 674.) Defendant does not question that finding, and the evidence clearly supports it.

In noting aggravating factors, the court referred to defendant's conduct causing harm, but pointed out that the factor was inherent in the offense. It indicated that defendant was in a position of trust. Defendant claims that this aggravating factor was improper because it did not exist at the time of the offense and applies to sex-related offenses. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(a)(13).) While it is true that the legislature has decided that certain statutory factors are to be given weight in determining whether a more severe sentence should be imposed, it is incorrect to say that a court may not consider nonstatutory factors in aggravation. (*People v. Allen* (1983), 119 Ill. App. 3d 845.) The sentencing hearing is an inquiry into pertinent facts and circumstances to enable the court to exercise its discretion in determining the length of a sentence. The trial court's observation that defendant was in a position of trust was not an abuse of discretion. Furthermore, the trial court immediately spoke of the mitigating factors precluding the death penalty. Even if the court's consideration of this factor was improper, it mentioned the position of trust in passing; in the context of imposing the sentence the factor carried little weight. See *People v. Gold* (1991), 221 Ill. App. 3d 187.

In mitigation, the court cited defendant's supportive family and his lack of a significant criminal history. It noted that defendant was not present when the acts which resulted in death were committed and that Sheila was the "major player." The court referred to defendant's difficult position of maintaining innocence, yet showing remorse. It considered proportionality with Sheila's sentence with respect to natural-life imprisonment. Thus, the court considered and weighed factors in aggravation and mitigation.

Although defendant argues that his sentence does not reflect his potential for rehabilitation, this court has previously held that a defendant's rehabilitative potential is not entitled to more weight than the seriousness of the offense. (*People v. Wright* (1987), 161 Ill. App. 3d 967.) Defendant has cited to *People v. Crews* (1969), 42 Ill. 2d 60, wherein the defendant's death sentence for murdering a two-year-old child was reversed and a 20- to 35-year sentence was imposed. However, the defendant in *Crews*, in addition to other mitigating factors, consumed excessive anti-depressant drugs which reduced her ability to control her feelings. Defendant's reliance on *People v. Treadway* (1985), 138 Ill. App. 3d 899, can also be distinguished because the offenses therein were perpetrated in a fleeting moment of intoxicated rage upon a stranger. Different from both *Crews* and *Treadway* is here defendant deliberately plotted to harm Quinten in order to pursue a civil action in damages against the manufacturer of baby formula to collect money.

The trial court adequately addressed the mitigating factors in this case, and it is not our duty to reweigh the various factors involved in the sentencing decision. (See *Streit*, 142 Ill. 2d at 19.) We find no abuse of discretion.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

UNVERZAGT and WOODWARD, JJ., concur.